COMMONWEALTH vs. VINCENT J. FLEMMI.

Suffolk.    April 16, 1974. — September 26, 1974.

Present: ROSE, GOODMAN, & GRANT, JJ.

*Practice, Criminal,* New trial, Appeal, Judicial discretion, Disclosure of evidence, Waiver. *Evidence,* Disclosure of evidence, Impeachment of witness. *Witness,* Cross-examination, Impeachment. *Error,* Whether error harmful.

Even though the issues raised by a criminal defendant's motion for a new trial were based entirely on facts fully known to him at the time of his trial, where the motion judge considered those issues in the exercise of his discretion he preserved them for consideration on appeal. [535]

A criminal defendant, who offered no objection to evidence of a telephone conversation between him and a witness and actively encouraged its introduction, and who, upon discovering that the conversation had been taped, neither moved to strike the conversation nor for a mistrial, waived his rights to complain that the Commonwealth's failure to serve him with a complete copy of the recording as required by G. L. c. 272, § 99 (O) (2), was prejudicial error. [539-541]

A finding by a judge hearing a motion for a new trial that there was no merit in a contention by the criminal defendant that a statement he made during a telephone conversation with a witness "was exculpatory" was based on oral evidence heard by the motion judge and was binding on this court on appeal. [541-542]

The record in a criminal case did not show that the defendant, who moved to "be furnished with all statements" by a witness against him and with a tape recording of a telephone conversation between him and that witness, had been denied access to a memorandum of the conversation, and a motion for a new trial based on unlawful denial of access was rightly denied. [542-543]

At a criminal trial, where the defendant sought to prove that testimony by a prosecution witness had been induced by promises of leniency in an indictment against the witness in an unrelated case,

error, if any, in the exclusion of evidence that such indictment had
been for first degree murder rather than for manslaugher, to
which the witness had pleaded guilty, was harmless where the
defendant's counsel, through cross-examination of the witness and
testimony of the witness' attorney, acquainted the jury with essen-
tially the same information which he was prevented from intro-
ducing directly.   [543-546]

INDICTMENTS found and returned in the Superior Court
on January 7, 1970.

The cases were tried before *Hudson*, J., and a motion
for a new trial was heard by *Dwyer*, J.

*Charlotte Anne Perretta* for the defendant.

*Thomas J. Mundy, Jr.*, Assistant District Attorney, for
the Commonwealth.

ROSE, J.   In March, 1970, the defendant was tried
before a judge of the Superior Court (the trial judge) and
a jury on indictments charging assault with intent to
murder, assault by means of a dangerous weapon and
unlawful carrying of a firearm.   He absconded before the
completion of the trial and was defaulted.   The trial
continued without him, and the jury returned verdicts of
guilty on all three indictments.   He was not apprehended
until seven months later, by which time his ordinary
rights of appellate review had been lost.   See G. L.
c. 278, § 33H (as inserted by St. 1964, c. 634, § 2).   He
thereafter filed a motion to remove the defaults and for a
new trial.   The trial judge denied that motion and
imposed sentences.   The Supreme Judicial Court affirmed
those actions in *Commonwealth* v. *Flemmi*, 360 Mass.
693 (1971).

In June, 1972, the defendant again moved for a new
trial pursuant to G. L. c. 278, § 29 (as amended through
St. 1966, c. 301), on grounds not raised by his previous
motion.   The trial judge had died, and the motion was
heard by another judge of the Superior Court (the motion
judge).   The defendant now appeals under G. L. c. 278,
§ 33B, from the denial of that motion.

As the issues raised by the second motion for a new trial were based entirely on facts fully known to the defendant at the time of his trial, [1] the Commonwealth challenges his right to have them decided on his appeal from the denial of that motion. While a motion for a new trial may not ordinarily be used as a vehicle to compel review of such questions (*Commonwealth* v. *McLaughlin,* 364 Mass. 211, 229 [1973], and cases cited), the defendant relies on the exception to that rule which sometimes exists when the issues reach constitutional dimensions (see *Earl* v. *Commonwealth,* 356 Mass. 181, 184 [1969]; *Commonwealth* v. *Penrose,* 363 Mass. 677, 681 [1973]; *Picard* v. *Connor,* 404 U. S. 270, 272, n. 3 [1971]; but see *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 58-59 [1974]). We need not decide whether the present case falls within that exception, however, as the motion judge could, in his discretion, consider those issues and thereby preserve them for our consideration on appeal. *Commonwealth* v. *Blondin,* 324 Mass. 564, 567 (1949), cert. den. 339 U. S. 984 (1950). *Commonwealth* v. *McGrath,* 361 Mass. 431, 435, n. 2 (1972). *Commonwealth* v. *Thompson,* 362 Mass. 382, 384, n. 2 (1972). It is clear from the record of the hearing on the motion and from the findings entered thereon by the motion judge that he so exercised his discretion. Contrast *Commonwealth* v. *McLaughlin,* *supra,* at 229-231.

We therefore proceed to the merits. The issues raised by the motion before us arose in connection with the testimony of two Commonwealth witnesses, both of

[1] The motion judge also found against the defendant on his further claim that he had been denied effective assistance of counsel following the trial, but the motion appearing in the record contains no such claim. Whatever status this claim might have, it has not been argued in this appeal, and we treat it as waived. Rule 1:13 of the Appeals Court, 1 Mass. App. Ct. 889 (1972). See *Commonwealth* v. *Saferian,* 366 Mass. 89, 90, n. 1 (1974).

whom were incarcerated at the time of the trial for un-
related offenses and both of whom gave evidence highly
damaging to the defendant. The first of those witnesses
was one Abboud, the victim named in the two assault
indictments against the defendant, both of which (to-
gether with the indictment for unlawful carrying of a
firearm) were generated by the same incident. The
controversy regarding Abboud's testimony concerns a
telephone conversation he had with the defendant a few
days after the incident and certain events surrounding
that testimony which occurred during the trial. The issue
before us with regard to the other witness, one Carita, is
the propriety of the trial judge's exclusion of certain
evidence.

Abboud's version of the incident itself was substantially
as follows. The defendant was rumored to have accused
Abboud of "talking to the cops," and Abboud sought him
out at a restaurant on the evening of the incident to
discuss the matter. The two men left the restaurant in
Abboud's automobile together with a friend of Abboud
who drove. Abboud sat on the passenger side of the
front seat but was turned around toward the defendant,
who sat in the back seat. Abboud saw the defendant
draw a pistol and swing it up in Abboud's direction, at
which point Abboud catapulted himself into the rear of
the automobile in an effort to wrest the gun away from
the defendant and "fire the shots off." The driver fled
from the moving vehicle when the struggle began.
Abboud was bitten on the hand by the defendant. Dur-
ing the struggle the gun went off, but Abboud was not
shot. The driverless car soon came to a stop when it
crashed into a parked car, and Abboud then took flight.
Abboud later learned that the defendant had been
wounded in the shoulder. Abboud soon encountered a
man walking a dog, gave the man an explanation of his
disheveled condition (later admitted to have been false),
and got the help of the man and the man's wife in
dressing the bite wounds and in notifying the police.
Several days later Abboud became an inmate at the

Charles Street jail, where he had another conversation which will be described later in this opinion.

The foregoing testimony was elicited during Abboud's direct examination by the prosecutor. It was partway through that examination that the subject of the controversial telephone conversation was first broached. The defendant's counsel promptly moved for a voir dire. There followed a bench conference which was not reported after which the defendant's counsel stated that he had "no objection to this conversation." Abboud then testified as to his recollection of the conversation, which consisted mainly of threats by the defendant against Abboud and his "loved ones." At one point the defendant's counsel urged the prosecutor to "refresh his memory," and the latter apparently used some document for that purpose. The record of the trial does not disclose what that document was and contains no further reference to it, though it later became a major focal point in the defendant's motion for a new trial. Abboud's testimony as to the substance of the conversation consumed less than three of the fifty-three pages of the trial record devoted to Abboud's direct examination, and was followed by testimony concerning subsequent events.

At the conclusion of Abboud's direct examination the defendant's counsel requested another bench conference (this one reported) in which he made two oral motions: (1) to be furnished with Abboud's testimony before the grand jury, and (2) to "be furnished with all statements in the possession of the District Attorney's office, given by this witness, having to do with circumstances that took place that night" (sic). The trial judge agreed to examine the grand jury minutes to determine the existence of a particularized need.[2] The following colloquy then occurred:

---

[2] See Commonwealth v. DeChristoforo, 360 Mass. 531, 534-536 (1971), overruled only prospectively in Commonwealth v. Stewart, 365 Mass. 99, 103-108 (1974). The judge's disposition of this motion is not before us in any event.

DEFENDANT'S COUNSEL: "All right, your Honor. I point out to Your Honor and I'd argue on these motions that the witness has told one story on the witness stand, but apparently told a different story . . . to the first persons he met after this incident. I also point out, Your Honor, at the bench here, with regard to my previous motion for a voir dire, . . . the Assistant District Attorney indicated that this witness was going to testify with regard to the telephone conversation that the defendant said, 'Why did you try to shoot me?' And he has not so testified during the course of that conversation."

THE PROSECUTOR: "Get it on cross-examination. It's as simple as that."

The discussion then shifted to the subject of the false account of the incident which Abboud gave to the man with the dog and to the man's wife, and contained no further reference to the telephone conversation. After a recess the judge ruled on the motion relating to the grand jury minutes, and the following colloquy ensued:

DEFENDANT'S COUNSEL: "May I also have my motion for statements . . . that he furnished law enforcement officers?"

THE JUDGE: "Well, what do you say about that?"

THE PROSECUTOR: "Well, Your Honor, I know of no law in this Commonwealth where statements by witnesses must be furnished to defense counsel."

THE JUDGE: "I'll deny that motion and save your rights."

Abboud was cross-examined at length before the defendant's counsel reached the subject of the telephone conversation, when he learned for the first time that the conversation, with Abboud's consent and coöperation, had been tape recorded by the police. When asked whether during that conversation the defendant had said, "Why did you shoot me?," Abboud answered in the negative. This was immediately followed by another colloquy:

DEFENDANT'S COUNSEL: "I'll renew my motion, if Your Honor please, to produce."

THE JUDGE: "What?"

DEFENDANT'S COUNSEL: "Any statement."

THE JUDGE: "No. I'll exclude it and save your rights. We have been over that already and I have already excluded it."

The defendant's counsel then moved (again orally) "that the defense be furnished the tape recording of this conversation." He argued that he needed the tape to establish the fact that the defendant had asked Abboud "Why did you shoot me?" The judge denied the motion, and the defendant's counsel excepted. The subject was ended (and never again raised at the trial) by the following exchange:

THE JUDGE: "I am referring specifically to the tape recorder" (sic).

DEFENDANT'S COUNSEL: "Yes."

THE JUDGE: "Not the conversation as related from the witness stand by this witness or any other witness."

DEFENDANT'S COUNSEL: "Yes, Your Honor."

No effort was made by the prosecutor at any time to introduce the tape recording in evidence.

In his 1972 motion for a new trial the defendant asserted that he had been prejudiced and denied certain statutory and constitutional rights (1) by the introduction of Abboud's testimony about the telephone conversation with the defendant, and (2) by the "refusal" of the trial judge and the Commonwealth to permit the defendant to inspect a "transcript or memorandum used by the state's principal witness to refresh his recollection" about the conversation which contained "highly exculpatory material." The defendant's motion did not, however, challenge the trial judge's denial of the motion to produce the tape itself.

In support of the first of these contentions the defendant relies on G. L. c. 272, § 99 (O) (2) (as appearing in

St. 1968, c. 738, § 1): "In any criminal trial where the commonwealth intends to offer in evidence any portions of [certain types of] recording[s] or transmission[s] or any evidence derived therefrom . . . the defendant shall be served with a complete copy of each recording or a statement under oath of the evidence overheard as a result of the transmission. . . ." The parties have stipulated that no such service was ever made upon the defendant or his counsel.

We need not decide whether G. L. c. 272, § 99 (O) (2), is applicable to the conversation involved here, however, as we are of the opinion that the defendant waived his rights thereunder and any constitutional rights which that section was designed to protect. At the hearing on the 1972 motion the defendant testified that he thought the conversation would help his case and told his counsel to "[g]et it introduced as evidence." His original trial counsel (who had long since ceased to represent the defendant) testified at the hearing on the motion that he had discussed the conversation with the defendant before its introduction in evidence, that he had expected Abboud to admit that the defendant had asked "Why did you shoot me?", and that he had offered no objection to its introduction because he believed the testimony about the conversation "would have been favorable to the defendant." The record of the trial, which shows that the defendant's then counsel (found by the motion judge to be "a highly experienced and skilled practitioner in the trial . . . of criminal matters") offered no objection to the testimony about the conversation but actively encouraged the introduction of that testimony, is wholly consistent with such explanation. We conclude that the introduction of that testimony "was a product of a deliberate tactical decision of defense counsel." *Commonwealth* v. *Hurst*, 364 Mass. 604, 608 (1974). That tactical decision was in no way altered by the belated disclosure that the conversation had been tape recorded, for the sole reaction of the defendant's counsel to that disclosure was to seek access to the tape rather than to

move to strike the earlier testimony or for a mistrial. The possibility of a violation of G. L. c. 272, § 99 (O) (2), was never even suggested to the trial judge. "Either [the defendant's] present contention is an afterthought, or he withheld it in the hope of tactical advantage." *Commonwealth* v. *LaBella*, 364 Mass. 550, 554 (1974).

This brings us to the defendant's contention that he was unlawfully denied access to the "transcript or memorandum" about the conversation and to the "highly exculpatory material" supposedly contained therein. The "transcript or memorandum" was the document previously referred to in this opinion, the existence of which was obliquely suggested on but one occasion in the record of the trial. It was stipulated at the hearing on the 1972 motion for a new trial that there had been such a document used to refresh Abboud's recollection of the telephone conversation, but that it could no longer be found. The prosecutor, who was testifying on November 3, 1972, more than nineteen months after the trial, could not recall whether the document was "a transcript of the exact conversation" or merely "someone's memory" thereof.

It was also stipulated that the "highly exculpatory material" referred to in the defendant's motion, which consisted of his asking Abboud "Why did you shoot me?", had appeared in the memorandum and was a substantially accurate account of what had been said in the conversation. The latter part of that stipulation was necessary because the portion of the tape recording which contained the statement at issue had since been "negligently erased by the Commonwealth." The motion judge was therefore forced to rely on oral testimony concerning the context in which the "exculpatory" remark was made and more particularly concerning Abboud's response thereto. According to the defendant, Abboud replied that he shot the defendant because the defendant had claimed that Abboud "was talking to the cops" — which, if true, was tantamount to an admission that Abboud had been the aggressor. The prosecutor, how-

ever, testified that the memorandum gave Abboud's response as: "Why did I try to shoot you? You tried to shoot me." The prosecutor also testified that he had informed the defendant's counsel and the trial judge of this part of the conversation at the unreported bench conference which was held before the conversation was introduced in evidence. The defendant's then counsel neither verified nor denied this.

The motion judge found and ruled that "[t]he defendant's contention that the aforementioned self-serving statement ['Why did you shoot me?'] . . . made during the telephone conversation was exculpatory is without merit when viewed in the totality of the telephone conversation and the damaging admissions made by the defendant therein." We take this to import a finding that Abboud answered the defendant's "exculpatory" question as the prosecutor testified. That finding, being based on oral evidence heard by the motion judge, is just as binding upon us as one made by a trial judge on a motion for a new trial (compare *Commonwealth* v. *Blondin*, 324 Mass. 564, 566 [1949], cert. den. 339 U. S. 984 [1950]) or one made by a Justice of the Supreme Judicial Court on a petition for a writ of error (compare *Guerin* v. *Commonwealth*, 339 Mass. 731, 734 [1959]). Contrast *Commonwealth* v. *Libby*, 358 Mass. 617, 619 (1971); *Commonwealth* v. *Richardson*, 1 Mass. App. Ct. 348, 349 (1973). Thus, it would appear that the omitted portion of the telephone conversation was not exculpatory and the defendant cannot, therefore, complain of its alleged suppression. *Commonwealth* v. *Masskow*, 362 Mass. 662, 669-670 (1972). It follows that the ruling of the motion judge was correct.

We also reject the defendant's contention that he was unlawfully denied access to the memorandum of the conversation for the further reason that the record discloses no such denial. Though both the defendant and his counsel were aware of the memorandum of the conversation from the outset of Abboud's testimony on the subject, no demand was ever made for its inspection.

Compare *Commonwealth* v. *Earl,* 362 Mass. 11, 14 (1972). The motion judge appears to have found that the defendant's counsel did make a motion for the production of the memorandum, but we are of the opinion that the record affords no basis for such a finding. The defendant's counsel made no motion addressed to the memorandum. While he did make and renew a general motion to "be furnished with all statements" by Abboud (who had made statements to several police officers on one or more occasions), there was no showing that the memorandum did in fact contain such a "statement." The memorandum was plainly not within the scope of the motion to be furnished with the tape recording. When he made those motions counsel did not once even mention the memorandum to the judge. Indeed, it is not clear to us that counsel ever intended to move for production of the memorandum. He testified that he had "a memory of approaching the witness stand and standing behind [Abboud] as he was testifying from that document . . . .." This might well have afforded counsel all the opportunity he needed to read the document.

The defendant's remaining contention relates to an evidentiary ruling during the cross-examination of the Commonwealth witness Carita. Carita's testimony on direct examination was substantially as follows. He had been incarcerated at the Charles Street jail when he learned that the defendant, a friend of his, had arrived at the same institution by reason of the offenses charged in the present indictments. Carita visited the defendant at the latter's cell, where he was informed by the defendant that he had tried to shoot Abboud, that Abboud had gotten away, and that Abboud was also an inmate at the Charles Street jail. The defendant requested Carita to seek out Abboud and persuade him, by threats if necessary, not to testify against the defendant. Carita complied with the defendant's request. At the time Carita was awaiting trial for offenses unrelated to this case. Shortly after the events described above he had pleaded guilty to manslaughter, and he was serving a lengthy

sentence on that account at the time he testified. There was no evidence that he had received any promise of leniency for his testimony against the defendant.

The defendant's counsel sought to prove that Carita's testimony had been induced by such promises. To that end the defendant's counsel attempted to introduce evidence that the indictment against Carita had been for first degree murder rather than for the lesser charge to which Carita had pleaded guilty. The trial judge, subject to counsel's exception, excluded that evidence.

The defendant asserts that the trial judge thereby denied him an adequate opportunity to exercise his right of cross-examination. He emphasizes that the purpose of introducing the excluded evidence was not to show that Carita may have actually committed the more serious crime but to establish a strong motivation on Carita's part for giving false testimony in exchange for acceptance of his plea of guilty to the lesser charge. The defendant argues that he had a right to cross-examine Carita as to whether he had been offered leniency in return for his testimony (*Commonwealth* v. *Dominico*, 1 Mass. App. Ct. 693, 713-714 [1974]), that this right extended to evidence of the entire relationship between Carita and the Commonwealth authorities (cf. *Commonwealth* v. *Redmond*, 357 Mass. 333, 336-338 [1970]; *Commonwealth* v. *Arsenault*, 361 Mass. 287, 300-301 [1972]), and that Carita's original detention for first degree murder and the prospect of his permanent incarceration for that offense were material elements in that relationship (cf. *Alford* v. *United States*, 282 U. S. 687, 693-694 [1931]). The defendant also relies on *Commonwealth* v. *Connolly*, 356 Mass. 617, 626-627 (1970), as giving him a right to introduce the murder indictment as a part of the record of Carita's conviction for the purpose of impeaching Carita's credibility.

We need not decide upon the validity of any of these propositions, however, as we are of the opinion that the error, if any, was harmless. The defendant's counsel was

permitted to cross-examine Carita at length as to his motives for entering the guilty plea, as to how he had communicated his intention to do so to the authorities, and as to the details of his conversations with the authorities and with his own attorney on those subjects. Carita's attorney was later called as a defense witness (Carita having waived his attorney-client privilege) and was permitted to testify about those conversations. The frequency with which the defendant's counsel sought admission of evidence of the murder charge and the nature of the questions he put to Carita and Carita's attorney as he repeatedly approached that subject could not but alert the jury to the purpose and motive of the interrogation. It was made known to the jury that the homicide of which Carita was convicted had been committed in conjunction with an armed robbery of which he was also convicted,[3] a combination of circumstances from which jurors exposed to newspapers and television would normally infer that someone had been murdered. There were frequent references during the testimony of Carita's attorney to the Commonwealth's "recommending" that Carita's plea of guilty to a manslaughter charge be "accepted" — a strange choice of words if Carita had been indicted for nothing more serious than manslaughter. The examination of Carita's attorney also elicited information about the duration of the sentence which might have been imposed[4] and about the unlikelihood of

---

[3] The manslaughter and robbery convictions both appear to have been an aftermath of the reversal of previous convictions of murder and robbery in *Commonwealth* v. *Carita*, 356 Mass. 132 (1969).

[4] DEFENDANT'S COUNSEL: "When you discussed with him what the maximum sentence was for manslaughter, did you at the same time discuss the alternatives if he were found guilty of something other than manslaughter if the case went to the jury?"

THE WITNESS: "Oh, certainly. And he was aware of that, too."

DEFENDANT'S COUNSEL: "That the alternatives were much more serious than the maximum penalty for manslaughter?"

Carita's being paroled[5] if he had been convicted of the offense charged in the indictment. We conclude that all of this could scarcely help but apprise the jury that Carita had been indicted for an offense far more serious than manslaughter. Thus, the defendant's counsel succeeded in acquainting the jury indirectly with essentially the same information that he was prevented from introducing directly.

*Order denying motion for
new trial affirmed.*

THE WITNESS: "This is one of the reasons why he continually, from the time that the new trial opinion came down from the Supreme [Judicial] Court, . . . wanted to plead guilty to manslaughter at all times, because he did not want his case to go to the jury for fear that the penalty he might have received would be much more severe."

[5] THE WITNESS: ". . . He was well aware of the maximum sentence, the sentences which might be imposed and the parole possibility, and good time. He was more aware of that than I."

DEFENDANT'S COUNSEL: "By that you mean, he was aware and discussed with you the fact that if the Commonwealth didn't recommend the manslaughter, then it was likely that he would never receive a parole, is that correct?"

THE WITNESS: "That what? Would you say that again?"

DEFENDANT'S COUNSEL: "That it was likely an alternative he might never receive a parole, as opposed to the maximum sentence on the manslaughter? He was aware of that, was he not?"

THE WITNESS: "Well, he was certainly aware that if the District Attorney did not recommend manslaughter and the Court didn't accept it, that his case would have gone to the jury."