COMMONWEALTH vs. MICHAEL J. KANE.

Plymouth. October 4, 1984. — December 31, 1984.

Present: GRANT, KAPLAN, & FINE, JJ.

*Practice, Criminal,* New trial, Presence of defendant, Instructions to jury,
Presumptions and burden of proof, Assistance of counsel, Fugitive from
justice, Waiver of appellate rights. *Constitutional Law,* Assistance of
counsel.

Where a criminal defendant failed to return to court after a recess in his trial,
the judge should have conducted a formal inquiry into the voluntariness
of the defendant's disappearance before deciding to proceed with and
complete the trial in his absence, although, in the circumstances, the
judge's informal treatment of the matter did not amount to error. [134-
135]
In the case of a criminal defendant who failed to return to court after a recess
in his trial and who was not apprehended until the trial had concluded,
the judge erred in permitting the prosecutor to make remarks which
deliberately and repeatedly directed the jury's attention to the defendant's
absence. [135-136]
In the case of a criminal defendant who failed to return to court after a re-
cess in his trial and who was not apprehended until the trial had con-
cluded, it was error requiring reversal for the judge to instruct the jury
respecting the defendant's flight as showing consciousness of guilt,
where he gave no accompanying instruction that the jury should not
convict on the basis of evidence of flight alone and that they might, but
need not, consider such evidence as one of the factors tending to prove
guilt, and where, moreover, the jury had no evidence before them on
which to base a finding whether the defendant's absence was voluntary.
[135-138]
A judge's misstatement of the presumption of innocence in his charge to the
jury in a criminal case, and his summarizing of the evidence in a manner
which improperly disfavored the defendant, necessitated reversal of the
defendant's conviction. [138-140]
At the hearing on a motion for a new trial of a criminal case the judge should
not have excluded from evidence records showing leniency in the dispo-
sition of numerous charges against the chief prosecution witness, since
this information was relevant to what the witness might reasonably have
believed would be his reward for giving evidence against the defendant.
[140-142]

At a criminal trial, the failure of defense counsel to object to pervasive and obvious errors in the judge's instructions to the jury deprived the defendant of his constitutional right to effective assistance of counsel. [142]

It is the province of the appellate court, and not the court whose decision is being challenged, to determine whether a criminal defendant's appeal should be dismissed because of his fugitive status. [142-146]

INDICTMENT found and returned in the Superior Court on October 28, 1976.

The case was tried before *Francis P. Cullen,* J., sitting under statutory authority, and a motion for a new trial was heard by him.

*Bernard M. Grossberg* for the defendant.

*Mary Ellen O'Sullivan,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant, Michael J. Kane, was tried on January 3-5, 1978, upon an indictment returned on October 28, 1976, for the crimes of breaking and entering in the nighttime with intent to commit a felony (G. L. c. 266, § 16) and larceny from a building (G. L. c. 266, § 20), allegedly committed on September 11, 1976. We rest reversal of the defendant's conviction of these offenses mainly on the material errors of the trial judge in instructing the jury. The instructions we hold erroneous were not objected to at the time, but in the special circumstances of the case are saved for appellate review by a motion for a new trial, made by successor defense counsel, which the judge mistakenly denied.[1]

1. *Summary of the Trial.* We first give an impression of the substance of the trial. During the morning session of the first trial day, January 3, 1978, the Commonwealth's case stood thus. Lenora Rugman, owner with her husband of land, house, and barn in a rural part of Hanover, testified that having shut (but probably not locked) the doors of the barn on September 10, 1976, she awoke the following morning to find that various pieces of mechanical and other equipment, known by her to have been in the barn, were missing.

---

[1] The procedural posture of the case on the present appeal is considered at points 2(d) and 3 of this opinion.

The Commonwealth called Dennis Gibson, who was under indictment for the same offenses and currently an inmate of the house of correction at Deer Island after convictions on unrelated charges. He said he had known the defendant for two and a half years and was staying with him in Marshfield on September 10. A few days earlier he had accompanied the defendant to a car rental company where the defendant hired a 1976 Ford LTD automobile. In that car, he and the defendant drove to the Rugman place, arriving there about 12:30 A.M., September 11; another person (suggesting Paul Blanchard) was present with a van. The defendant and Blanchard, passing through a cornfield, went to the barn, opened the shut door, entered, removed pieces of equipment and carried them some one hundred feet to the van. Gibson said he assisted at the van, but otherwise was acting as a lookout. About 3:30 A.M. the men drove off.

Cross-examination of Gibson commenced with questions inquiring in detail when and where he had given information to the police about this and other breaks; then the examination veered to the subject of any promises made to him by the police to induce him to inform or to reward him for doing so. At this point in the cross-examination the luncheon recess was called.

When the court reconvened about 2:00 P.M. the defendant, who had attended the morning session, and had not been under restraint, was absent. The judge temporized with the situation by indicating to the jury that one of the attorneys was ill; he said trial would be suspended until the next morning. With the jury still in their seats, the prosecutor drew attention to the fact that the defendant was not present. Defendant's counsel asked whether that matter could not wait until the jury were gone. The jury were then excused.

At the bench, counsel said he had asked the defendant to go home (a short distance from the courthouse) and bring in his wife by two o'clock; she might be needed as a witness. At 2:45 P.M. the prosecutor noted the time and asked for an arrest warrant. The warrant issued. The defendant remained

absent from the courtroom and was not apprehended until after the period of the trial.

Trial resumed on January 4, with further, detailed cross-examination of Gibson. It consisted of proof of Gibson's criminal convictions and inquiry into his meetings and interviews with police officers and assistant district attorneys, as well as talks with his own attorney at the time, directed to the question of promises or other inducements held out to him to procure his cooperation. Gibson indicated that he expected he would be rewarded in some way, at least by a favorable statement from the prosecution to the judge at sentencing on the Rugman break and on the numerous other charges as to which he had admitted his guilt to the officers. However, except for an answer, "I was told maybe, yes," in response to a question whether an assistant district attorney had promised him long probation,[2] Gibson resisted any concession in his testimony that he had been given specific promises. Defendant's counsel sought to present enough evidence to raise an inference that Gibson could reasonably have understood that he was being assured a long suspended sentence or long probation covering all the charges. On redirect, Gibson attributed his cooperation with the Commonwealth to a conscientious change of heart.[3]

---

[2] Gibson also said, "I believe it was Mr. [Sheldon] Cohen [then Gibson's attorney] said that somebody was going to shoot for a long probation."

[3] Gibson's collaborative efforts were extensive. He had a large number of interviews with the local and State police and assistant district attorneys. Admitting his own involvement in a series of breaks, Gibson was taken on a cruise to locations in Hanover, Pembroke, Rockland, and Abington where breaks had occurred, and he offered information about them. He testified at length before a grand jury on October 27, 1976, and one of the consequences was the indictment of the defendant and Blanchard, as well as Gibson himself, for the Rugman break.

Gibson received some immediate rewards. The police interceded on his behalf with the reserve unit of Marines where he was in trouble for nonattendance. They appear to have gotten Gibson relieved of bail on one of the criminal charges against him, and with one exception, his sentences on some eight convictions during the period October, 1976, to May, 1977, were trivial, suggesting intervention in his favor. The exception was a sentence of two years to the Deer Island house of correction, which Gibson was still serving when he testified at trial in the present case.

When Gibson stepped down, the Commonwealth called Robert Gay, manager of the car rental place, who said a rental contract of a 1976 LTD wagon was written with a "Michael S. Kane" on September 8, 1976. Gay asserted that he knew the defendant but had not handled this contract and had not seen the customer at the time. Over objection by the defense, the prosecutor, in the form of showing the witness' "identification" of the defendant at a prior car transaction, got in references to the defendant's absence from the courtroom.

The Commonwealth's last witness was Paul Hayes, a Hanover police officer. He had appeared at the Rugman's house on the morning of September 11, and made certain observations: footprints leading from the barn in the direction of the putative location of the van; tracks consistent with the use of a van, etc. Hayes testified to interviews with Gibson and the cross-examination again stressed the question of inducements offered to Gibson.

On the third day of trial, after short continued cross-examination of Hayes, the prosecutor, taking him on redirect, started with the question, "Officer Hayes, you see Mr. Kane in the courtroom today?" At bench conference, counsel moved for a mistrial. He argued that the prosecutor's question compounded the damage done by him earlier in calling attention to the defendant's absence. The judge asked counsel whether he wanted to offer evidence about the defendant's whereabouts. Counsel said he could not do so. The wife, he added, now was saying that the defendant in fact had taken her to a hospital. The prosecutor contributed the information that police, armed with the warrant, had gone to the defendant's home, but failed to locate him there; counsel said the wife had called the defendant's friends without result. It was noted that the defendant's car was still in its place. Mistrial was denied.

Resuming the redirect examination of Hayes, the prosecutor pressed home with questions eliciting, over objection, the answers that the defendant had been absent from the court since the first morning recess. The Commonwealth rested and a motion for a required finding of not guilty was denied.

The defense called Robert Fernandez, a State police officer assigned to the district attorney's office in Plymouth County.

He had taken part in conversations with Gibson. The questioning went to any special treatment of Gibson calculated to loosen his tongue and assist the Commonwealth.

Next came John Doherty, an assistant district attorney. Defendant's counsel attempted to question Doherty about a November 15, 1977, hearing on the indictments arising from the Rugman theft, and in particular what Gibson, who was present at the hearing, might infer from his attorney's statement to the court about any expectation of a lenient sentence. The prosecutor's objection, apparently on hearsay grounds, was sustained, and little was elicited from the witness.

Earlier on that day of trial the defense made known that it wanted to call Gibson's attorney as a witness. The attorney had received a summons to appear and was in the courthouse on the first trial day. Evidently there had been some acrimony in an exchange between the attorney and defense counsel about his reluctance to remain available and return to court to testify. Counsel asked that the attorney be required by bench warrant to attend or, alternatively, that a transcript of the November 15, 1977, hearing be admitted in evidence. When the prosecutor complained that the defense had waited to the eleventh hour to call this witness, the judge denied the request. The matter of bringing the attorney into court was renewed after Doherty's testimony, but without result. The defense rested.[4]

The judge's instructions are considered at point 2 below.

2. *Errors Claimed on Motion for New Trial.* We deal with the matters raised on the motion for a new trial filed by successor counsel on June 22, 1982 (but not passed on until September 9, 1983).

(a) *Treatment of defendant's "flight."* Rule 18 of our Rules of Criminal Procedure, after stating that a defendant is entitled to be present at all critical stages of the proceedings, provides

---

[4] Defendant's counsel in his closing argument adverted to the defendant's absence and asked the jury to deal lightly with it; the defendant might have departed out of dissatisfaction with his, counsel's, performance. The prosecutor said: "Isn't it strange that the main witness, Mr. Gibson, took the stand here Tuesday and the defendant hasn't been seen since then? . . . I think we can all use common sense ourselves as to what happened here."

in clause (a)(1), 378 Mass. 887 (1979), that "[i]f a defendant is present at the beginning of a trial and thereafter absents himself without cause . . . the trial may proceed to a conclusion" except for the imposition of sentence. As a note of the Reporters indicates, "without cause" translates as "voluntarily." Reporters' Notes to Mass.R.Civ.P. 18, Mass. Ann. Laws, Rules of Criminal Procedure at 366 (1979). The rule does not enter upon the details of determining whether an absence is voluntary but all acknowledge that the Sixth Amendment right of confrontation of a defendant should not be exalted to the point of putting the orderly conduct of a trial at the mercy of his possible disinclination to face the prosecution. See *Commonwealth* v. *McCarthy,* 163 Mass. 458, 459-460 (1895); *Government of the Virgin Islands* v. *Brown,* 507 F.2d 186, 189-190 (3d Cir. 1975). The question of mistrial is, of course, for the judge, not the jury. The Commonwealth bears the burden of persuasion on the question of voluntariness, see *Greenberg* v. *United States,* 280 F.2d 472, 476 (1st Cir. 1960), but it is not suggested that the evidence must attain to the level of "beyond a reasonable doubt."[5] There ought to be as vigorous an effort as may be feasible to find the defendant, and some formality in the presentation of the evidence that is gathered about the circumstances of the defendant's disappearance. See, e.g., *Commonwealth* v. *Flemmi,* 360 Mass. 693 (1971).

When trial in the present case was resumed on January 4, virtually nothing had been ascertained about the defendant's disappearance. We are left with an indifferent impression of the later report of a police effort to locate the defendant. The judge received casual statements of counsel without undertaking to hear direct testimony; the police, at least, were available. However, on the whole we are not disposed to go so far as to hold that it was error to go on with the trial.

As urged on the new trial motion, there was serious error in the treatment of the defendant's absence vis-à-vis the jury.

---

[5] Further information about the defendant's absence from court may become available when, finally, he is brought in for sentencing, and the defendant may then seek a new trial on the claim that his absence in fact was involuntary. See *Commonwealth* v. *Flemmi,* 360 Mass. 693, 694-695 (1971).

The prosecutor deliberately and repeatedly directed the imaginations of the jurors to the missing defendant. A jury may raise very damaging inferences from the bare fact that the defendant has somehow flown. This the judges recognize, see *Goitia* v. *United States,* 409 F.2d 524, 528 (1st Cir. 1969), and we find them warning juries wholly to disregard the fact. See *Taylor* v. *United States,* 414 U.S. 17, 18 (1973), aff'g 478 F.2d 689, 690 (1st Cir. 1973); *State* v. *Parham,* 174 Conn. 500, 504 (1978). Cf. *Commonwealth* v. *Townsend,* 6 Mass. App. Ct. 890, 891 (1978). Here emphatic iteration by the prosecutor, although objected to, was not checked. However, the vice in the judge's approach to the anomaly of the vanished defendant concentrated itself in his final instructions to the jury. Such information as there was about the circumstances of the absence had been imparted to the judge at bench conferences; none of it was heard by the jury. They had only the sight of an empty chair. In this light, we have to appraise the judge's instruction, as follows:

> "On the question of consciencousness [*sic*] of guilt of the defendant. A person indicted for a felony shall not be tried unless he is personally present during a trial of his case unless he waives this right therefrom; unless he absents himself from the trial by not appearing. This came up in this case. You may consider, if you find the defendant after the jury was empaneled for the trial of a felony wantonly absents himself from the trial. This is a question you may consider on the question of conscienceness [*sic*] of guilt along with the evidence you have before you. The fact that the defendant was here at the beginning of the trial, was here when the jury was empaneled, all of this is to be taken into consideration as to whether or not you wish to consider this on the question of conscience-ness [*sic*] of guilty."

The first quoted full sentence weakly paraphrases rule 18 but omits the crucial "without cause"; anyway, it speaks to mis-

trial, which is not the jury's problem. The rest, as far as intelligible, looks like an attempt at describing the relation of flight to consciousness of guilt, as that may be probative of actual guilt of the crime charged. Yet the jury were asked to reason from no more than the empty chair. This was plainly wrong: a showing of the circumstances of the absence or "flight" had to be made — and made, at this stage, in conformance with the usual rules of evidence — before the jury could fairly be asked to decide whether the absence was "wanton" (here the judge's apparent substitute for "voluntary"). See the practice in *Commonwealth* v. *Clark,* 5 Mass. App. Ct. 673, 675, 677 n.5 (1977); *Commonwealth* v. *Brimage,* 6 Mass. App. Ct. 869, 870 (1978); *United States* v. *Hyson,* 721 F.2d 856, 864 (1st Cir. 1983); *United States* v. *Touchstone,* 726 F.2d 1116, 1118 (6th Cir. 1984). But cf. *Commonwealth* v. *Clark,* 267 Pa. Super. 513, 517 (1979). Instead of inviting the jury to speculate without restraint,[6] there might well have been a warning — a final one in the judge's charge — against any guesswork; a "flight" instruction was inapposite and could only provoke trouble.

Quite apart from all this, the instruction was erroneous because, as a charge purporting to deal with flight, it did not say, with anything approaching adequate clarity or force, that the jury should not convict on the basis of evidence of flight alone, and that they might, but need not, consider such evidence as one of the factors tending to prove guilt. It is true that at the time of trial *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982), had not been decided; but the requirements there laid

---

[6] The problem here is comparable to that where, at ordinary trial, with the defendant present, evidence is offered of his initial flight from the police, or the like, as some proof of consciousness of guilt. If the evidence offered is very weak — for example, if little demonstration is offered that the defendant was absent from his usual haunts — it should be excluded or the jury charged against making the inference. See *Commonwealth* v. *Carita,* 356 Mass. 132, 140 (1969); *Commonwealth* v. *Haraldstad,* 16 Mass. App. Ct. 565, 570 (1983). Compare *Commonwealth* v. *Toney,* 385 Mass. 575, 582-583 (1982); *Commonwealth* v. *Booker,* 386 Mass. 466, 468, 470 (1982).

We note, incidentally, that, in asking defense counsel whether he wanted to offer evidence about the defendant's absence, the judge apparently mistook where the burden lay.

down were not arcane, they were based on the decided cases and common sense. Compare *Miller* v. *United States,* 320 F.2d 767, 769-773 (D.C. Cir. 1963); *United States* v. *Myers,* 550 F.2d 1036, 1048-1051 (5th Cir. 1977), cert. denied, 439 U.S. 847 (1978). Circumspection is called for in formulating any "flight" charge, see *Toney* at 584-585, and we venture to say that clear cautionary instructions are especially important where the subject is flight during trial: on the one hand, flight at that late stage may well be less indicative of guilt than the more common flight immediately after the criminal event or knowledge of pursuit by the police;[7] on the other hand, a jury may be tempted to see a defendant's flight during trial as his flight from the witness stand and count this against him despite the Fifth Amendment. In this connection we observe that an instruction that the failure of a defendant to testify raises no inference against him was neither requested nor given.[8]

(b) *Instructions on the facts and on presumptions.* Further statements in the judge's charge improperly disfavored the defendant and constitute independent grounds for reversing the convictions. It is permissible and may well be helpful for a judge to give a précis of the evidence on either side, thus pointing the jury to the questions of fact they have to decide, and enhancing their ability to apply the law to the facts as found. What is not permitted according to the law in this Commonwealth is for the judge to array the facts with a bias (whether or not conscious) and so in effect to "comment" on the evidence, to convey his own view of where the weight of the evidence lies. See *Commonwealth* v. *Diaz, ante* 29, 34-35 (1984), and cases cited.[9] In the present case the judge recited in

---

[7] The element of immediacy is significant, see *United States* v. *Myers,* 550 F.2d at 1050, although it may not be controlling. See *Commonwealth* v. *Connors,* 18 Mass. App. Ct. 285, 290-291 (1984). Cf. *Commonwealth* v. *DeMarco,* 387 Mass. 481, 483 n.1 (1982).

[8] For the fusion of Sixth and Fifth Amendment considerations in mid-trial "flight" cases, see *Goitia* v. *United States,* 409 F.2d at 528; *United States* v. *Touchstone,* 726 F.2d at 1119; *State* v. *Parham,* 174 Conn. at 504.

[9] General Laws c. 231, § 81, forbidding "comment," in strictness may not be applicable to criminal trials, see *Commonwealth* v. *Ramey,* 368 Mass. 109, 113 (1975), but the principle surely carries over.

detail the events of the night of September 10 as testified to by Gibson, with added testimony from the witnesses Gay and Hayes. Then he said by way of conclusion, "These are findings of fact that it is your responsibility to find and draw any reasonable inferences that you may draw from them." The language was unfortunate.[10] As Gibson had fully implicated the defendant, this could be taken to finish the defendant off, unless, perhaps, he came forward with an explanation. While the judge elsewhere charged that Gibson's own interest should be considered as bearing on his credibility, he did not descend to details about the testimony bearing on Gibson's assistance to the police or on what he may have understood he had been promised — testimony that covered the larger part of the transcript of trial. The imbalance was aggravated by the judge's saying, "You heard that he's [i.e., Gibson is] another thief who is serving time in the Deer Island House of Correction, that he knew the defendant Kane." The other thief pointed to could be taken to be the defendant: the judge appeared to be echoing the prosecutor's remark in his summation to the jury, "We have one thief talking about another thief. Reminds me of the old expression, 'It takes a thief to catch a thief.' And that's exactly what we have here."

Again, the judge had difficulty with the problem of presumptions. He said, once more disfavoring the defendant, "The presumption of innocence remains with the defendant until evidence of guilt is introduced. It then disappears but the defendant is entitled to require the government to satisfy the jury of facts that he is guilty. Guilty beyond a reasonable doubt." This passage mangled and contradicted the customary, classical statement that the presumption of innocence continues throughout the case. Liacos, Massachusetts Evidence 50 (5th ed. 1981). McCormick, Evidence 967 (3d ed. 1984).[11] The impact of the

---

[10] See the rather similar misdirection in *Miller* v. *United States,* 320 F.2d at 769.

[11] The judge charged that the defendant should be presumed to "intend" the "natural and probable consequences of his own act." This was error, but committed before elucidation by the United States Supreme Court. See *DeJoinville* v. *Commonwealth,* 381 Mass. 246 (1980).

remark probably was not lessened by the reference to guilt beyond a reasonable doubt. At best the quoted instruction was a goulash.

(c) *Gibson's assistance to the prosecution, and his expectations of leniency.* The very substantial cooperation of Gibson with the police and law enforcement officials has been described above at n.3. Undeniably, Gibson might reasonably has expected some reciprocal help from these beneficiaries at sentencing time, but there is a question how much. The defense contends that the judge unduly hampered its efforts during trial to attack Gibson's credibility by showing his reasonable expectation of very high reward; so also the defense contends there was error in the judge's treatment of the evidence on the matter that was tendered post trial.

At trial, despite protest, the judge refused to take steps to bring Mr. Sheldon Cohen, Gibson's attorney, to the courtroom to testify, with particular interest attaching to what he might say about the hearing of November 15, 1977, on the then pending indictments arising out of the Rugman break. Perhaps the refusal fell within the range of the judge's discretion, but we are frank to say that it would have been better if he had taken minimal measures — perhaps a telephone call by the clerk of court — to reach the attorney and have him testify with a view to seeing how the episode might have affected Gibson at the time (and also when he testified two months later at the defendant's trial).

Gibson's attorney was called as a witness at the evidentiary session of the new trial motion on January 10, 1983. He claimed some loss of memory about details, but the substance of his testimony was that no definite promise had been communicated to him. A transcript of the November 15, 1977, hearing (conducted by a judge other than the present trial judge) was now admitted in evidence. This amounted to a discussion of when the indictment against Gibson could be disposed of (evidently by a guilty plea). Gibson was then serving time at Deer Island with the date approaching of probable release on ordinary parole, but it was understood that parole was not possible while the Rugman indictment was outstanding. The question then re-

verted to when the trial could be set for the defendant (and Blanchard) since the Commonwealth would want Gibson to remain under indictment until he testified against the others. The attorney said, "[O]bviously he [Gibson] was going to be given consideration for that testimony relative to a bargaining situation, which of course your Honor is not a part of or any judge is not a part of, when it was time then for Mr. Gibson to in fact plead." Further, he spoke of the parole-and-indictment position as "going to affect his [Gibson's] ability to get out on the street"; if the Rugman matter were resolved, Gibson could apply for one-third time, making him eligible to be "placed on the street in the very, very near future." This can, although with some difficulty, be read to mean there was an expectation that, after testifying against the defendant (and Blanchard), Gibson would offer guilty pleas and, on the prosecutor's recommendation accepted by a judge, be sentenced on all the twenty to thirty pending indictments (including the Rugman indictment) in such a way as to be "out on the street."

Although the judge admitted the November 15, 1977, transcript, he refused to admit, on grounds of irrelevance, the fact of record (set out in the defendant's offer of proof) that about eight weeks after the trial herein, on March 3, 1978, Gibson was in fact sentenced by the trial judge as follows: seven to nine years in M.C.I., Walpole, suspended, on one indictment; five years probation on a second indictment to run concurrently; the remaining twenty-odd indictments placed on file. In our view, this exclusion of the Gibson epilogue — amounting to the judge's explicit refusal to give weight to a fact known to him — was mistaken or at least inadvisable, as the actual sentence reflected upon what Gibson could believe would or might be his final reward for giving evidence against the defendant.[12]

In his brief findings of fact on the new trial motion, the judge concluded that no promises were made on the part of the Commonwealth; the Commonwealth had merely indicated that

---

[12] On the implication of promise from performance, compare Restatement (Second) of Contracts § 4 comment a (1981).

Gibson's cooperation would be made known to the sentencing judge. This was not quite on the mark; the true question was what Gibson might reasonably infer or suppose, and in this context the distinction between promise and indication of cooperation becomes shadowy. Nevertheless, we are not prepared to say that the judge's finding is clearly erroneous, or to hold that there was material error in restricting the defendant's right to attack Gibson's credibility.

(d) *Ineffective assistance of counsel.* This also was a ground of the new trial motion, but as no evidence on the proposition was offered or received, we are confined to the record of the trial proper. Having in view particularly (a) and (b) above, it seems to us that there was "behavior of [defense] counsel falling measurably below that which might be expected from an ordinary fallible lawyer" (*Commonwealth* v. *Saferian,* 366 Mass. 89, 96 [1974]) in that he failed to observe and object to instructions by the judge that were pervaded with obvious error. This behavior, we further believe, "likely deprived the defendant of an otherwise available, substantial ground of defense" (*ibid.*), for, as indicated above, the errors overlooked by counsel were material. We do not speculate on what verdict the jury might have brought in, had the instructions been correct and fair. The fact, as we see it, that counsel provided ineffective assistance, and particularly in respect to the instructions, should assure that the defendant is not embarrassed on this appeal by the failure of his counsel to register objections at trial to the very instructions. (See also the discussion at point 3 below of the procedural status of the present appeal.)

3. *The Course of Proceedings.* As noted, the defendant was convicted on January 5, 1978, for crimes committed some fifteen months earlier. An appeal from the judgment was claimed on January 23, 1978. The Commonwealth moved to dismiss the appeal on February 3, 1978, and the motion was allowed by the trial judge on March 1, 1978, presumably by reference to *Commonwealth* v. *Rezendes,* 353 Mass. 228 (1967), although the judge did not explain his decision. His

decision appears incorrect.[13] Around April 28, 1978, the defendant was apprehended. On that day the judge sentenced him to a term of from nineteen years, six months, to twenty years in M.C.I., Walpole, on the single indictment in two counts (twenty years being the maximum for the breaking and entering, and five years the maximum for the larceny).[14] Subsequently, on appeal to the Appellate Division, the sentence was reduced to twelve to eighteen years in M.C.I., Walpole.

On May 4, 1978, counsel moved for reconsideration of the dismissal of the appeal. The judge did not hear the motion until September 10, 1979, and then, apparently, only after an application was made to the single justice of the Supreme Judicial Court to energize the proceedings. There was a second hearing on October 23, 1979, with denial of the motion to reconsider on November 6, 1979, some eighteen months after the motion was initiated. On November 28, 1979, counsel claimed an appeal from the denial.

We find a pro se application on February 27, 1980, seeking relief under Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979) (postconviction relief — new trial), and also free transcripts,

---

[13] In *Rezendes,* the court dismissed an appeal when it appeared at argument that the appellant was then a fugitive. Explaining *Rezendes,* the court said in *Commonwealth* v. *Green,* 353 Mass. 687, 690 (1968), "Our cases do not go beyond deciding that one who is in escape from custody cannot insist that his appeal be heard." It is up to the appellate court, not the court whose decision is being challenged, to decide whether to hear the absent defendant's appeal; hence the notice of appeal should not have been dismissed by the trial judge. In the present case, indeed, the defendant was apprehended and no longer "in escape from custody" when the appeal would have been heard in the ordinary course. As further support for the view that it was error for the trial judge to dismiss the appeal in the present case, see *Commonwealth* v. *Hurley,* 391 Mass. 76, 77-80 (1984); *Commonwealth* v. *Richards,* 10 Mass. App. Ct. 911 (1980), and 1 Mass. App. Ct. 821, 822 (1973); *Commonwealth* v. *Brown,* 11 Mass. App. Ct. 288, 290-291 (1981).

[14] The defendant had a past criminal record. There was objection at sentencing to the disclosure that the defendant was under a number of indictments at the time.

The imposition of a single sentence for two crimes seems irregular. We construe it to consist of sentence on the major crime with another concurrent sentence, though unmentioned. Cf. *Kinney, petitioner,* 5 Mass. App. Ct. 457, 459 (1977); *Baranow* v. *Commissioner of Correction,* 1 Mass. App. Ct. 831 (1973).

recusal of the judge, dismissal of counsel, and appointment of new counsel. The entire application was denied without hearing two weeks later, on March 13, 1980. In June, 1980, there was renewed resort to the single justice, who remanded to the trial level for consideration of rule 30(b) relief and the appointment of fresh counsel.

New counsel, appointed about July 22, 1980, promptly secured an order for a free trial transcript, but on inquiring of the clerk of the Superior Court he was told that a transcript had not been prepared. It turned out that the stenographer could not locate her notes. At length the notes were found; a partial transcript was delivered by August 5, 1981, but evidently it was not completed until December 3, 1981.

On June 16, 1982, defendant's counsel filed the motion for a new trial whose content has been indicated above. Counsel at that time moved for written findings on the new trial motion, and for leave to submit a post-hearing memorandum. A hearing was not held until January 10, 1983, when there was testimony of witnesses on one part of the motion (see point 2[c] above). The judge agreed that he would rule on the entire new trial motion, with prior opportunity for counsel, on receipt of a transcript of the testimony, to present memoranda on the points of law raised on the motion.

There was another hearing on June 2, 1983, upon an outstanding "extraordinary" motion to reopen evidence filed on January 21, 1983, and upon a pro se motion of May 25, 1983, to revoke and revise sentence. Evidence was received on these motions.

On September 6, 1983, the judge denied without findings all pending motions (including a further motion that was filed on August 31, 1983, to "stay sentence").

On September 22, 1983, counsel filed a claim of appeal from the denial of the new trial motion. At the same time he moved for reconsideration of that motion, pointing out that he had not been given a chance to file a memorandum;[15] in the al-

---

[15] Counsel had indicated at the June 2, 1983, hearing that if the judge allowed the motion to revise or revoke or the "extraordinary" motion to re-

ternative he sought findings on the denial of the new trial motion. Thereupon, on October 13, 1983, the judge made negative findings on the new trial motion (as mentioned at 2[c] above) and on the "extraordinary" motion as well.[16]

On February 2, 1984, counsel moved pro forma to reinstate the appeal from the conviction; this may be deemed denied.

Even if an appeal from the conviction is considered to be still alive, it is in itself of little consequence because of the negligent failure of defense counsel to make proper objections on crucial matters. Upon the motion for a new trial under Mass.R.A.P. 30(b) the judge, although technically not required to pass upon claimed errors not preserved through objection and appeal from the conviction, nevertheless could undertake to do so in the exercise of his discretion; and we take the understanding reached at the January 10, 1983, hearing to represent such an undertaking. His negative decision on the motion has thus been open to review here, as at point 2 above. See *Commonwealth* v. *Blondin*, 324 Mass. 564, 566-567 (1949) (Qua, C.J.), cert. denied, 339 U.S. 984 (1950);[17]

---

open, the new trial motion might become inapposite, and with it the memorandum he had undertaken to present. The judge, however, denied all three motions without allowing for the memorandum on the new trial motion.

[16] The occasion for the "extraordinary" motion was that new counsel learned of the existence of a transcript of an interview of Gibson on October 19, 1977, conducted by the assistant district attorney who prosecuted at trial, and attended also by another assistant district attorney and the two police officers who later testified. There was mention at this interview of "long probation." As found by the judge, however, this was not a novel discovery, as the transcript was in the hands of original counsel at the time of trial. Gibson's testimony at trial about "long probation" has been set out at point 1 above.

[17] "Ordinarily such errors occurring during the progress of a trial should be followed by immediate objection and exception, in order that they may be corrected at once, and cannot become the ground of a subsequent motion for new trial, unless the judge sees fit in his discretion to reconsider the matters involved. . . . But in this instance the judge passed seriatim upon all the defendants' requests for findings and rulings and has allowed bills of exceptions founded upon them. We think that he exercised his discretion in favor of considering them, as he might well do in the circumstances. We are further of opinion that this course has preserved for our consideration the questions of law as to which exceptions have been duly saved. This ac-

*Commonwealth* v. *McGrath*, 361 Mass. 431, 435 n.2 (1972); *Commonwealth* v. *Thompson*, 362 Mass. 382, 384 n.2 (1972); *Commonwealth* v. *Harrington*, 379 Mass. 446, 449 (1980); *Commonwealth* v. *Flemmi*, 2 Mass. App. Ct. 533, 535 (1974).[18]

All that needs to be said of the proceedings just recited is that the Commonwealth bears responsibility for much of the delay of disposition. Meanwhile the defendant has been incarcerated, on the basis of a record containing material errors, for a period of more than six and a half years, a period that approaches the point of normal eligibility for parole on the sentence imposed as adjusted by the Appellate Division.

The judgment of conviction must be reversed. In all the circumstances, we think it appropriate to add that, in any aspect of the case that may arise after rescript, the Commonwealth — prosecutor and judge — should give due consideration and weight to the defendant's service of sentence. Cf. *Manning* v. *Superintendent, M.C.I., Norfolk*, 372 Mass. 387, 395 (1977).

*Judgment reversed.*
*Verdict set aside.*

---

cords with the decision in *Peterson* v. *Hopson*, 306 Mass. 597, 602-603 [1940], and with a number of intimations in others of the more recent cases . . . It has been said that the practice is the same on both the civil and criminal sides of the court. . . . We therefore deal with all substantial questions of law raised by exceptions in connection with the motions for new trial and argued in this court." 324 Mass. at 566-567.

[18] For cases where the trial judge declined as matter of discretion to consider the claimed errors, see *Commonwealth* v. *Rodriquez*, 334 Mass. 703, 704 (1956); *Commonwealth* v. *Underwood*, 358 Mass. 506, 510-511 (1970); *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 229-231 (1973); *Commonwealth* v. *McWhinnie*, 5 Mass. App. Ct. 877, 877-878 (1977); *Commonwealth* v. *Dunn*, 6 Mass. App. Ct. 881 (1978).