COMMONWEALTH *vs.* ROSEMARY STACK
(and nine companion cases[1]).

No. 97-P-2075.

Hampden. December 7, 1999. - May 25, 2000.

Present: JACOBS, KAPLAN, & PORADA, JJ.

*Search and Seizure,* Automobile, Probable cause. *Constitutional Law,* Search
and seizure. *Probable Cause. Practice, Criminal,* Instructions to jury, Voir
dire, Assistance of counsel. *Armed Assault in a Dwelling. Conspiracy.
Evidence,* Consciousness of guilt.

Police officers lawfully stopped two motor vehicles after observing traffic
violations and, when the drivers were unable to produce licenses to oper-
ate, had probable cause to arrest the drivers. [233-234]
In the circumstances of police officers' lawful stop of two vehicles, ordering
the passengers out of the vehicles was a reasonable and lawful precaution
for the officers' protection [234-235], and loaded shotguns in plain view
were lawfully seized and provided probable cause to search the vehicles
for further contraband [235].
At the trial of four defendants for conspiracy to commit armed assault in a
dwelling, error, if any, in the judge's instructions, which did not instruct in
detail on the "target" offense (armed assault in a dwelling), did not create
a substantial risk of a miscarriage of justice, where the evidence of the
conspiracy was strong. [235-236]
Evidence of the trial of an indictment for conspiracy was sufficient to
demonstrate that the defendant participated by communicating to the other
conspirators her willingness to join in the conspiracy and warranted her
conviction of conspiracy to commit armed assault in a dwelling. [236-238]
At the trial of indictments for conspiracy to commit armed assault in a dwell-
ing, there was evidence that the target address was a dwelling. [238]
Error at the trial of a criminal case in the judge's instruction to the jury on
consciousness of guilt was harmless in light of the evidence of the
defendant's guilt. [238-239]
At the trial of conspiracy indictments the judge properly exercised his discre-
tion to question the venire collectively, and not individually, on the issue
of possible antigang prejudice [239-240], and to decline to ask two special
questions of the venire on possible racial or ethnic bias [240-241].

[1]One indictment against Stack, three indictments against Richard Gonzalez,
three indictments against Frank Gonzalez, and two indictments against Raul
Cortes, Jr.

On appeal from criminal convictions, defense counsel was not demonstrated to have provided ineffective assistance for failing to file a motion for a change of venue. [241]

At a criminal trial, an isolated short emotional outburst of a Commonwealth witness was not shown to be prejudicial, in light of the evidence and the judge's instructions to the jury. [241-242]

INDICTMENTS found and returned in the Superior Court Department on July 20, 1994.

A pretrial motion to suppress evidence was heard by *Judd J. Carhart*, J., and the cases were tried before *John F. Murphy, Jr.*, J.

*James R. Knudsen* for Frank Gonzalez.

*Thomas C. Foley* for Richard Gonzalez.

*Susan Murphy* for Raul Cortes, Jr.

*James Hammerschmith*, Committee for Public Counsel Services, for Rosemary Stack.

*Thomas H. Townsend*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. In April, 1995, the named defendants-appellants (and other defendants not involved in the present appeal) were tried to a jury on events that occurred about a year earlier. The appellants were convicted as follows:

> Rosemary Stack, Richard and Frank Gonzalez (brothers), and Raul Cortes, convicted of conspiring, see G. L. c. 274, § 7, to commit an armed assault in a dwelling, G. L. c. 265, § 18A;

> Stack and the Gonzalez brothers, convicted of conspiring, see G. L. c. 274, § 7, to murder Marcos Serrano, G. L. c. 265, § 1[2];

> Gonzalez brothers and Cortes, convicted of possession of a sawed-off shotgun, G. L. c. 269, § 10(c), and ammunition, G. L. c. 259, § 10(h); the convictions on the latter charge were placed on file.

They severally raise issues to be discussed below.

---

[2]Of other indicted defendants, not involved in this appeal, Juan Irizarry and Virgilio Berrios entered guilty pleas; Victor Polanco was convicted of conspiracy to commit armed assault in a dwelling and possession of a sawed-off shotgun and ammunition.

A. *The evidence*.[3] (1) In the course of executing a search warrant, State Troopers Steven Griffin and John Michel discovered drug paraphernalia and some cocaine in a shoe box under the bed of Iris Espada in her apartment in Agawam. The date was February, 1994. When asked by police whether she was associated with the "Latin Kings," a gang known to be operating in Springfield and Holyoke, Espada said no, but she added she had earlier been offered membership. In fact, Espada in November, 1993, had become acquainted with Richard Gonzalez; in December, 1993, she saw Richard frequently, and on more than one occasion during this period Richard asked if she would like to become a fellow member of the Latin Kings. She had declined. Now, responding to Troopers Griffin and Michel, Espada began by agreeing to introduce an officer to one of her neighbors known to be dealing drugs; later she went further and decided to join the Latin Kings for the purpose of acting as an informant.[4] She joined in early April.[5] Thereafter Espada regularly communicated with the troopers, met them before and after gang meetings, and gave them copies of gang documents.

(2) From the beginning, Espada served as recording secretary and a "Crown" (a leader) of the Kings. She attended her first official meeting of the gang on April 23, 1994. Before the meeting, Espada joined in Springfield with the Gonzalez brothers, Raul Cortes, Juan Irizarry, Virgilio Berrios, and other members, and they traveled together in several cars to gather at the Holyoke apartment of Rosemary Stack. One of these cars was a

---

[3]Principal witness for the Commonwealth was Iris Espada, a confidential informant, who spoke mainly to the formation of the conspiracies. State Trooper Griffin testified to the criminal investigation and to his collaboration with Espada. Holyoke police Officers Gaudreau, Dunn, Brown, Thomas, and Cournoyer testified chiefly about the apprehension of the defendants (other than Stack). Philip Langton testified as a ballistics expert.

The defendants did not offer evidence.

[4]As to Espada's possible motives, she was not charged with possession of the cocaine; an officer testified the cocaine found was only a trace and did not warrant prosecution. At the time, an assault charge was pending against Espada, and assault and battery charges were pending in Juvenile Court against her daughter; these charges remained pending at the time of trial of the present case.

Espada testified she agreed to help the police not for fear of prosecution but to put a stop to gang violence in the community

[5]In joining, Espada filled out a membership application. She turned this over to the troopers together with the earlier applications by Raul Cortes and Frank Gonzalez.

maroon Buick with a white top owned by Berrios. Officers conducting surveillance captured on videotape the cars arriving at Stack's place.

The meeting at Stack's, attended by fifteen to twenty persons, including the defendants who are appellants in this case, lasted two and one-half hours. Espada soon understood that Stack, the Gonzalez brothers, Raul Cortes, and Juan Irizarry were "Crowns." Richard Gonzalez, as chairman, asked Frank to open the meeting with a "family prayer." He led a discussion about collecting money to benefit imprisoned gang members and to buy weapons. He mentioned an "un tumbe"[6] mission to "find locations where [an opposing gang] sell drugs" so that armed members could "go in and assault them, take the drugs, take the weapons and take the money." Espada understood that in "un tumbe" missions members would be armed for protection but were not to plan to kill anyone.

Stack raised her hand, made a Crown symbol with her fingers, asked permission to speak, and said, "Don't forget about Mikey." Richard said there was a "green light on" to kill Mikey, and Stack then offered to look into a location for Mikey so that the "brothers" (the members) could carry out the mission. Stack was to get the information and pass it along. Thus ended the meeting.

(3) Espada had taken detailed minutes of the April 23 meeting, which were received in evidence at the trial in redacted form. The minutes record the murder plan about Mikey, but do not record the plan about other missions as to which Espada gave testimony. The minutes, however, mention a plan to borrow a shotgun from "Alf" and a program for members to meet on Saturdays and perform missions on Sundays when there was believed to be a less formidable police presence.

As to the ranking of members, the first page of the minutes lists Richard as president and Frank Gonzalez as vice-president of the Springfield Latin Kings, Espada president of the Springfield Latin Queens, and Stack president of the Holyoke Latin Queens. Espada testified that Raul Cortes was a Crown, but he does not appear with the other Crowns on the page.[7]

(4) The following Saturday, April 30, in early afternoon, Es-

---

[6] "Tumbar," the verb, translates as "to knock down."

[7] There was no substance in Cortes's objection to the admission of Espada's testimony that he was a Crown or to the objection of all defendants to the admission of the redacted minutes.

pada again met in Springfield with the same group as on April 23, plus Victor Polanco, before they drove in several cars, including Berrios's Buick, to Stack's Holyoke apartment. The group and other members convened outside the apartment and all proceeded to a park, Avery Field in Holyoke, there joining other Kings to a total of about twenty.

Upon arrival, the group of Crowns who had had a rendezvous in Springfield, now omitting Polanco, detached themselves and held a separate meeting. Espada had brought along her minutes of the April 23 meeting and asked these Crowns to sign if they found the minutes accurate. All signed. Raul Cortes, who did not understand English, signed after Espada translated the minutes for him.

These Crown members discussed the tasks to be performed that night: Richard Gonzalez summed up — to kill Mikey and to hit enemy locations to "make money, steal dope, and take the weapons." Stack reported she knew Mikey's location; she had seen him on the first floor of her apartment building. All agreed the murder would happen that night.

The group talked in particular about the "three different locations they were going to assault," namely, 118 Newton Street, Holyoke; 59 Margaret Street, Springfield; and another address in Springfield.[8] Richard said these locations were going to be "done" that night. Espada testified she tried "to persuade them not to do these missions" and asked the others to meet at seven o'clock that evening before setting out on the tasks. All shook hands as the parley ended, and they then joined the larger group on the basketball court. Police officers, filming at a distance, recorded the gathering on videotape, but could not pick up the conversations.

At seven o'clock that evening Stack telephoned Espada, had she heard from the brothers? Stack had seen Mikey; he had waved a gun at her. The brothers had not appeared at Espada's apartment but at eleven o'clock Richard Gonzalez called Espada and she told him there were "problems" (unspecified) in Holyoke. Richard said he knew and was on his way to Holyoke in Berrios's car.

Espada then called Trooper Michel who notified State and Holyoke police.

---

[8]The Holyoke address was familiar to Espada because her former brother-in-law had lived there. It is in a high crime area.

(5)[9] At rollcall, about 11:45 P.M., Holyoke police were told that a maroon Buick with a white top, transporting armed gang members, was on its way to Holyoke.[10]

Holyoke Officer Roger Gaudreau was patrolling in a marked cruiser at Nick Cosmos Way and Appleton Street in Holyoke at 3:30 A.M. that Sunday morning. He had not been present at rollcall but had the information about the Buick separately from Sergeant Lawrence Cournoyer, who had conducted the rollcall. Gaudreau came upon the Buick and a light-colored Datsun parked about a block from the Newton Street address. Although it was raining heavily, eight or so people were standing outside the vehicles. Upon noticing the cruiser, they entered the cars, which took off, the Datsun closely following the Buick. Alerted to gang activity, Gaudreau radioed for backup and followed the cars on their rather circuitous route. The Datsun did not turn on headlights. The Buick at one point swerved and its left-side wheels crossed over the yellow double center line. When Officers Patrick Brown and Christopher Dunn appeared as backup and joined in separate marked cruisers, Gaudreau activated his blue overhead lights. The Datsun pulled to the side of the road. Dunn stayed with Gaudreau. Brown continued to follow the Buick. (Dunn had attended roll call; Brown had spoken with Cournoyer.)

At the Datsun, Gaudreau approached the driver. He was unable to produce a license on request. On the officer's instructions, the driver left the car to stand at the rear with Officer Dunn. While speaking to the driver, Gaudreau noticed that the front passenger was "shifting around," his hands moving "all over in the interior"; he disregarded Gaudreau's order to keep his hands on the dashboard. Gaudreau "had no idea if he was trying to hide a weapon [or] pull a weapon out." Nor could Gaudreau, from outside the car, see into the back seat; the side windows were tinted. Worried for his safety (as he testified), Gaudreau drew out his gun and told the passenger to back out with his hands up; he then patted the man down for weapons, but found none. Dunn asked Gaudreau whether anyone was left

[9]The evidence following is drawn from the hearing on motions to suppress. It embodies the substance of the motion judge's findings denying the motions, to which is added some particulars from the record.

[10]Rollcall information, it seems, was based on what Troopers Griffin and Michel learned from Espada following the afternoon meeting, rather than on Michel's telephone conversation with Espada late that night.

in the car; Gaudreau said he didn't know. Dunn then opened the driver's side door, saw two men in the back seat, and ordered them to get out with their hands up. As one pushed the driver's seat forward (the Datsun had only two doors), Officer Sherwin, a new arrival, standing by Dunn, yelled, "Gun." Dunn saw the woodstock back end and part of the barrel of a shotgun protruding from under the driver's seat. Dunn removed the shotgun and found both barrels loaded. All occupants of the car were placed under arrest. The driver was Juan Irizarry, and the other occupants Cortes, Polanco, and Efrain Rivera.

Officer Brown meanwhile continued his pursuit of the Buick. He, too, had seen the Buick swerve across the center line. Within minutes he put on his blue lights, and the Buick moved to curbside. With Officer Kevin Thomas (newly arrived; he had attended rollcoll) Brown approached the driver. The driver said he had a driver's license but did not have it with him; he gave Brown his registration. Brown ordered the driver out of the car, patted him down (finding nothing), and seated him in the cruiser, intending to call in for information about the license. Officer Thomas, dealing with the passenger seated behind the driver, asked him to step out. Thomas had the man stand with Sergeant Lawrence Cournoyer (also arrived) who was at the rear passenger's side with gun drawn. Cournoyer testified he feared the outbreak of a firefight between his officers and the Buick riders. While patting down the passengers, Thomas saw the man remaining in the front seat kicking his feet as if pushing something under the seat. Thomas opened the passenger door and told the man to get out, at which point Thomas saw a gun barrel sticking out from under the front seat. Cournoyer also saw this. It was a loaded sawed-off shotgun. All occupants were arrested. Ammunition was found during a search of the car. The driver was Berrios, the front seat passenger Richard Gonzalez, and the rear seat passenger behind the driver Frank Gonzalez.

B. *Issues*. (1) *Suppression motions* (filed by Gonzalez brothers, Cortes). The Gonzalez brothers and Raul Cortes moved pretrial to deny the Commonwealth the use as evidence of the shotguns and ammunition taken without warrants. It was upon the Commonwealth to justify the seizures.

Police may stop a vehicle where they have observed a traffic violation, see *Commonwealth* v. *Bacon*, 381 Mass. 642, 644 (1980), here crossing the line (Buick) and driving with headlights off (Datsun). Then, as each driver failed to produce a

license on demand, in violation of G. L. c. 90, § 11, creating reason to suspect a violation of G. L. c. 90, § 10, or § 23, the police had probable cause to arrest him. See *Commonwealth* v. *Lantigua,* 38 Mass. App. Ct. 526, 528 (1995); G. L. c. 90, § 21. It will not do to inquire into possible collateral motives on the part of the police where the violation or offense is actual, not merely imagined for the occasion. See *Commonwealth* v. *Santana,* 420 Mass. 205, 209 (1995).

An exit order to a passenger not himself seen to commit any violation or offense conforms to the strict constitutional standard in this Commonwealth (see note 11, *infra*) if it responded to the reasonable apprehensions of the police about their own safety (or that of others). The police, it is said, may take "reasonable precautions for their own protection. Such precautions may include ordering occupants out of a car for questioning. *Pennsylvania* v. *Mimms,* 434 U.S. 106, 111 (1977). They may also include a search extending into the interior of an automobile, but they are 'confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.' " *Commonwealth* v. *Robbins,* 407 Mass. 147, 151 (1990), quoting from *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978). So we ask "whether a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger," *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 661-662 (1999), quoting from *Commonwealth* v. *Santana,* 420 Mass. at 212-213, considering the "specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." *Commonwealth* v. *Williams,* 46 Mass. App. Ct. 181, 184 (1999), quoting from *Commonwealth* v. *King,* 389 Mass. 233, 243 (1983).[11]

In the present case, officers had been informed that a given car would be transporting armed gang members to Holyoke. A car matching the description (along with a Datsun) was found idling in a high crime area in pouring rain at 3:30 A.M. with a group milling about (but dispersing at sight of a marked cruiser).

---

[11]We do not pause to describe how far Fourth Amendment rulings of the Supreme Court of the United States allow more leeway to police in ordering out from cars than do the rulings of the Supreme Judicial Court resting on art. 14 of our Declaration of Rights. See *Pennsylvania* v. *Mimms,* 434 U.S. at 111; *Maryland* v. *Wilson,* 519 U.S. 408, 414-415 (1997); *Knowles* v. *Iowa,* 119 S. Ct. 484, 488 (1998); *Commonwealth* v. *Gonsalves,* 429 Mass. at 660 n.2, 662-663.

Then we have furtive movements of persons suggesting attempts to conceal weapons. The persons (if any) in back seats could not be readily observed. The experienced supervising officer saw the scene as instinct with a prospect of armed combat. The ordering out of passengers and follow-up seem well within the range of lawful self-protective activity by the police.

The "plain view" rule empowered the police to seize the loaded shotguns at sight. See *Commonwealth* v. *Santana*, 420 Mass. at 211. There was probable cause to search the Buick for further contraband after the flushing out of the shotgun; thus the ammunition was properly seized. See *Commonwealth* v. *Bakoian*, 412 Mass. 295, 304-305 (1992).

(2) *Jury instructions* (all appellants). There was no objection by any of the defendants to the judge's instructions, but they now claim the judge erred in failing to instruct in detail about the particulars of the crime of armed assault in a dwelling (the so-called "target" offense). The judge charged in full about the crime of conspiracy — there is no complaint about this — then he read the then current statutory definition of the armed assault offense as follows: "Whoever, being armed with a dangerous weapon, enters a dwelling house and while therein assaults another with intent to commit a felony shall be punished by imprisonment . . . ." G. L. c. 265, § 18A, as appearing in St. 1969, c. 473. The defendants would have the judge explicate each term of this statutory statement, although the defendants were indicted for conspiracy, not for the armed assault proper (and in fact were intercepted before they could commit the latter offense). What the judge was bound to do was to inform the jury of the nature or substance of the object of the conspiracy. This he did by the statutory reference which in the present case conveyed by commonplace language a sufficient picture to the jury, against which the jury could measure the actual articulation by the conspirators of the purpose of the conspiracy to "go in and assault them," and so forth.

To require specific analysis of the particular terms of § 18A would be rather incongruous with the propositions that the crime of conspiracy is distinct from the target offense envisaged, see *Commonwealth* v. *D'Amour*, 428 Mass. 725, 747 (1999), and is complete when an agreement for a criminal purpose, express or tacit, is formed, although the details of the agreement have not been worked out, *Commonwealth* v. *Dellinger*, 10 Mass. App. Ct. 549, 556 (1980), *S.C.*, 383 Mass. 780

(1981) (rev'd on other grounds). Nor need all the conspirators be equally cognizant of every part of what has been agreed or what is afoot, see *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 493 (1921). As noted in *United States* v. *Williams*, 809 F.2d 75, 86 (1st Cir. 1986), cert. denied, 482 U.S. 906 (1987), the prosecution need only prove that a defendant charged as a conspirator knew the "essential features" and "general aims" of the venture.

The commonsensical view is that "[i]f the offense which was the object of the conspiracy were some technical or unusually complex offense of which the trier of fact has no general impression, a suitable instruction explaining such an offense would be mandatory," but not so where "[t]he jury as ordinary laymen have a general knowledge of what constitutes armed robbery [the target offense involved in the case] which is self-defining." *People* v. *Ambrose*, 28 Ill. App. 3d 627, 632-633 (1975). See *People* v. *Carey*, 94 Ill. App. 3d 631, 636-637 (1981). Compare: "The judge was correct in emphasizing the criminal intent required for conspiracy and describing the elements of [the target offenses] in more general terms." *Commonwealth* v. *Burke*, 20 Mass. App. Ct. 489, 508 (1985). The *Dellinger* case, 10 Mass. App. Ct. at 558, *S.C.*, 383 Mass. at 783-785, cited by defendants Stack and the Gonzalez brothers, is not inconsistent.[12]

If it be assumed that the judge erred in not going into the particulars of the target crime, then — since the defendants did not object to the instruction as given — the question would be whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). The evidence of a conspiracy to commit an armed assault was strong so there was no injustice in the convictions on the merits. So, too, it is hard to imagine that the jury verdicts might have been different if the instruction were more punctilious.

(3) *Sufficiency of evidence* (Stack and Cortes). The evidence of the guilt of the defendants in this case was powerful overall.

---

[12]Cases can be found containing expressions that seem to require full instructions on the object substantive crimes, but these can be explained as consistent with *Ambrose* or as having been let fall without distinct attention to the issue. See *United States* v. *Pincourt*, 159 F.2d 917, 919-920 (3d Cir. 1947); *People* v. *Cortez*, 18 Cal. 4th 1223, 1238-1239 (1998); *State* v. *Benavidez*, 127 N.M. 206 (Ct. App. 1999); *Commonwealth* v. *Young*, 474 Pa. 96, 99-100 (1977).

The defendant Stack, however, while making no claim that the evidence of her participation in the murder conspiracy as charged was insufficient, does make that claim in respect to the armed assault conspiracy.[13] Cortes also argues that his motion for a required finding on that charge should have been allowed.

a. Stack does not dispute that a conspiracy was formed to commit an armed assault at 118 Newton Street and she was aware of the fact; she protests that she did not share or participate in this conspiracy. It was upon the Commonwealth to show there was "at least a slight, though willing and knowing connection" between Stack and the conspiracy — the slight connection, however, to be proved beyond a reasonable doubt. *United States* v. *Marsh*, 747 F.2d 7, 13, appeal after remand, 747 F.2d 14 (1st Cir. 1984). See *Commonwealth* v. *Sylvester*, 400 Mass. 334, 339-340 (1987). "[T]he line that separates mere knowledge of the fact that a conspiracy exists from participation in the conspiracy is often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant had crossed that line." *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 250 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and 407 U.S. 914 (1972). The Commonwealth could prove Stack's participation by showing she communicated to other conspirators her willingness to join in the conspiracy. *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. at 249-250. She need not have performed an overt act, *id.* at 250, nor need she have intended to participate "directly and personally" in the substantive crime. *Commonwealth* v. *Nighelli*, 13 Mass. App. Ct. 590, 595 (1982).

Espada testified that at the April 30 meeting the Crown members discussed the tasks to be carried out that night, the plan to hit the three locations as well as to murder Mikey. As the meeting ended all Crown members shook hands. We think Stack's commanding voice in the murder conspiracy is not without inferential significance in respect to her relation to the other agreement (cf. note 13 above). Also probative are the facts that Stack figured as president of the Latin Queens, served as a host of the first planning session, and attended the second

---

[13]Although the indictments were properly framed, there is a measure of unreality in the suggestion of a sharp line of differentiation between the two compacts. It is more nearly conforming to the facts to say there was one agreement, to be carried out to substantive ends by the commission of dual crimes.

from which the conspiracies were hatched. (Contrast the facts in *Commonwealth* v. *Shapiro*, 10 Mass. App. Ct. 678, 682 [1980], where, although the defendant knew of the conspiracy, she "d[id]n't really know" other conspirators, was absent from planning sessions, and was not referred to as a collaborator by the others.) There could be a conclusion of joinder on Stack's part without testimony that she spoke distinct words to that effect. See *Commonwealth* v. *Favulli*, 352 Mass. 95, 113 (1967).

b. Stack and Cortes argue there was no proof the Newton address was a "dwelling," and, they say, if the object of a conspiracy does not satisfy the terms of the target statute, the conspiracy must fail. Without entering into a discussion of the validity of the attempted generalization, we may say, first, there was evidence that the Newton Street address was a dwelling,[14] but, second, it would not matter what the fact was, if the conspirators believed the place was a dwelling to which a mission was being directed and joined hands on this basis. See *Commonwealth* v. *Cantres*, 405 Mass. 238, 243-244 (1989).

c. A related matter. Espada gave testimony grievously hurtful to Stack on the third day of trial. The fourth day was to come after a three-day weekend. On that day Stack failed to return to court (and never reappeared). The prosecutor informed the judge that officers had heard on the street that Stack was planning to abscond. The judge defaulted Stack, issued a warrant for her arrest, and instructed the jury to draw no inferences from her absence.

The prosecutor later told the judge that the police, despite efforts, had failed to locate Stack, but the judge would not let him present evidence of the search to the jury. The defense moved for a hearing on the question whether Stack's absence was voluntary; the motion was denied. In his final instructions, the judge told the jury, if they found Stack had wilfully fled from the prosecution, they might consider that as consciousness of guilt, but were not to convict Stack on that basis alone. He added, "[Y]ou may not consider such even as one of the factors tending to prove" Stack's guilt; there were numerous reasons

---

[14]As noted, note 8, *supra*, Espada testified her former brother-in-law had lived there. Officer Gaudreau testified the address was a "tenement building with[] three or four floors."

In his charge the judge spoke of the "home" or "apartment" on Newton Street. The defendants did not object and the references appear casual, not intended as any conclusion by the judge.

why innocent persons might flee; innocent people sometimes have feelings of guilt. However, said the judge, if the jury believed Stack voluntarily fled from prosecution they might infer she was conscious of guilt and use that evidence together with other evidence in determining whether she was guilty. Compare *Commonwealth v. Toney*, 385 Mass. 575, 585 (1982). Stack objected to this instruction and moved for a mistrial; the motion was denied.

In *Commonwealth v. Kane*, 19 Mass. App. Ct. 129, 135 (1984), we disapproved of the kind of casual procedure followed by the trial judge (aggravated here by a somewhat self-contradictory instruction) and advised a vigorous effort to find an absconding defendant and some formality in presenting the evidence about her disappearance, if the jury were to be permitted to make any use of the circumstance of flight. Although the judge's mishandling in *Kane* perhaps went further than that in the present case,[15] we will assume there was error here. Stack's conviction of the murder conspiracy is so solidly supported that the error is easily held harmless in relation to it. The situation is not so clear as to her conviction of the other conspiracy, but, in our view, a like result is justified. (Sentences on the two charges run concurrently.)[16]

(4) *Voir dire issues.* a. *Individual voir dire about antigang prejudice* (Gonzalez brothers). By the second paragraph of G. L. c. 234, § 28, a judge, upon request, must examine prospective jurors individually where matters extraneous to the merits might impair their judgment. See Mass.R.Crim.P. 20(b)(2), 378 Mass. 890 (1979); *Commonwealth v. Grice*, 410 Mass. 586, 588 (1991). In certain cases, generally those involving interracial violent crimes, it is settled as matter of law that the risk of partiality exists and individual examination is required.[17] The mandatory classes do not extend to the present case. Compare

---

[15]For example, in *Kane* the prosecutor made a point of reminding the jury of the absent defendant, the vacant chair. *Id.* at 136.

[16]In the foregoing discussion, for the benefit of the defense, we make nothing of the fact that the Supreme Judicial Court has left open the question whether a defendant's failure to appear for trial on an assigned date, standing alone, may be taken as evidence of consciousness of guilt. See *Commonwealth v. Hightower*, 400 Mass. 267, 269 (1987). See also *Commonwealth v. Gonzalez*, 42 Mass. App. Ct. 235, 240 n.5 (1997).

[17]See *Commonwealth v. Sanders*, 383 Mass. 637, 640-641 (1981); *Commonwealth v. Young*, 401 Mass. 390, 398 (1987); *Commonwealth v. Stephens*, 15 Mass. App. Ct. 461, 463 (1983).

*Commonwealth* v. *Burgos*, 36 Mass. App. Ct. 903, 904 (1994). Thus the defendants were put to a demonstration that there was a "substantial risk that the case would be decided in whole or in part on the basis of extraneous issues." *Commonwealth* v. *Grice*, 410 Mass. at 588, quoting from *Commonwealth* v. *Mahoney*, 406 Mass. 843, 850-851 (1990). No such demonstration was forthcoming and the judge's exercise of discretion stands. Still, the judge took measures against possible prejudice. He told the panel evidence would appear that the defendants were members of the Latin Kings gang and he mentioned jurors' possible exposure to news reports about the case. Seventeen jurors confessed in answer to a question addressed to the venire that they held an antigang bias, and these were excused after short interviews at sidebar. In sundry decisions, similar procedures were thought adequate to secure the objectives of the statute,[18] and the defendants were entitled to no more.

b. *Special voir dire questions* (Gonzalez brothers). Under the first paragraph of G. L. c. 234, § 28, a judge is required to ask the panel — usually done by collective interrogation[19] — certain stated questions including the question whether any juror is sensible of bias or prejudice. The present judge complied. It was not error for him to decline to ask two special questions formulated by the defendant Frank Gonzalez to be put collectively: "Do you have any prejudice or bias when it comes to people of color?" and "Will you in any way be influenced, either pro or con, by the race of the defendant?" *Commonwealth* v. *Lumley*, 367 Mass. 213, 216 (1975), states that "[i]n the ordinary case, inquiries beyond the statutory questions, which raise generally the issue of bias, rest in the sound discretion of the trial judge." As various matters of race or ethnicity are comprehended in the individual voir dire questions of the second paragraph of § 28, it is hard to suppose that a judge could abuse discretion in rejecting special questions on these subjects for collective use under the first paragraph. Compare *Com-*

---

[18]*Commonwealth* v. *Estremera*, 383 Mass. 382, 390-391 (1981). *Commonwealth* v. *Hennessey*, 17 Mass. App. Ct. 160, 166-167 (1983). *Commonwealth* v. *Bodden*, 24 Mass. App. Ct. 135, 140 (1987). *Commonwealth* v. *Tatro*, 42 Mass. App. Ct. 918, 919-920 (1997).

[19]See *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 114 (1980), *S.C.*, 382 Mass. 387 (1981) (rev'd on other grounds); *Commonwealth* v. *Bodden*, 24 Mass. App. Ct. at 140.

*monwealth* v. *Pearce*, 43 Mass. App. Ct. 78, 85 (1997), *S.C.*, 427 Mass. 642, 649 (1998) (rev'd on other grounds).

(5) *Other issues*. a. *Ineffective assistance* (Gonzalez brothers). None of the counsel for individual defendants moved for a change of venue on grounds of hurtful pretrial publicity, and on this account there is now a claim that counsel for Richard and Frank Gonzalez rendered ineffective assistance. In the way of showing behavior by the press, the defendants point to an article about this case in the Springfield (Sunday) Republican,[20] dated about a month before trial; also to articles in Boston and Hartford newspapers about the Latin Kings in general, published some eight months to two years before trial (and, because of their dates and nature, now the subject here of a Commonwealth motion to strike, which we shall deny). All this is weak tea in any attempted demonstration that the defendants were deprived of a fair trial by being tried in the neighborhood of the alleged crimes. It should be recalled that the fact of some adverse publicity does not invite a change of venue; this is allowed "with great caution and only after a solid foundation of fact has been first established," *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990), quoting from *Commonwealth* v. *Smith*, 357 Mass. 168, 173 (1970), an appraisal resting in the judge's considerable discretion. *Commonwealth* v. *Colon-Cruz, supra.* On the whole, it is not made to appear that the motion, had it been made, would have stood much chance of being granted; thus counsel cannot be faulted for failing to make it. See *Commonwealth* v. *Conceicao*, 388 Mass. 255, 264 (1983).

In fact, there was attention to the question of publicity. The judge asked the venire collectively whether they had read in newspapers or heard on radio or television anything about this case, and he mentioned specifically the Sunday Springfield Republican Union of "a few weeks ago." Six jurors responded; none of them was seated. Also to be considered here is the judge's questioning about prejudice which, as already noted, resulted in excusing seventeen jurors for their antigang views.

b. *Espada outburst* (Gonzalez brothers and Cortes). Cross-examining Espada, counsel elicited from her that the gang had a "manifesto" calling for immediate expulsion of any member caught dealing drugs. But Espada added, "That is the front, what they show you. But exactly what the Latin Kings are are a

---

[20]The article was actually tendered during argument on the motion based on alleged bias against gangs.

bunch of drug" — here there was objection, which the court overruled, and Espada went on to say — "[T]he Latin Kings are a bunch of drug dealers, murderers . . . . They are not an organization, they are a gang; and I am here to testify to that." The judge might have reacted at once to the impending diatribe — and counsel might have moved to strike. The outburst was unfortunate and may be thought of as testimony out of turn about the bad character of the gang and thus of its members, particularly the defendants. See *Commonwealth* v. *Montanino*, 27 Mass. App. Ct. 130, 136 (1989).[21] If the judge was at fault, the effect was diminished by the fact that Espada had given testimony about drug distribution and murder as well, instigated by the gang, to which the questioned words added little but emotion. In the atmosphere of this extended trial, the short episode could count for little. We add that the judge in final instructions said that being a member of or associated with a gang was not itself a crime and the jury must consider the facts as to the individual defendants.

*Judgments affirmed.*

---

[21]There was a similar contretemps when, during redirect examination, Espada said she had falsified information on her membership application about locations of members of her family because the gang might sometime try to vent retribution upon them.