COMMONWEALTH vs. BARNABY JACK RICHE.

No. 99-P-1145.

Plymouth. October 6, 2000. - February 7, 2001.

Present: GREENBERG, KAPLAN, & DUFFLY, JJ.

*Search and Seizure,* Automobile, Threshold police inquiry. *Constitutional Law,* Search and seizure. *Threshold Police Inquiry.*

The circumstances of a police officer's lawful stop of a motor vehicle provided a reasonable basis for the officer to order the driver and passengers to alight from the car; contraband that fell from the person of one of the passengers as she emerged from the automobile was lawfully seized and correctly admitted in evidence at trial. [832-835]

INDICTMENT found and returned in the Superior Court Department on February 18, 1997.

A pretrial motion to suppress evidence was heard by *Patrick F. Brady,* J., and the case was tried before *Barbara A. Dortch-Okara,* J.

*Frank H. Spillane* for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. After jury trial in Superior Court, the defendant Riche was convicted of trafficking in cocaine in an amount of more than 28 but less than 100 grams, G. L. c. 94C, § 32E(*b*). He appeals, complaining that the court erred in denying his pretrial motion to exclude the cocaine from evidence.

Similar suppression motions were filed on behalf of Jerry Dessalines and Heather Rizzotto, persons also involved in the same episode, and there was a single hearing on the three motions. The motions were denied. Riche was tried separately, and convicted.

Our narrative of the actions of the police is consistent with, and somewhat more detailed than, the judge's findings.[1]

On December 22, 1996, State Trooper Stephen Lopes, a K-9 officer, was on overnight patrol shift in a marked cruiser in Brockton. About 2:30 A.M., parked near the "Round the Clock" convenience store on Belmont Street in Brockton, Lopes noticed a Pontiac Grand Am automobile leaving the premises and turning right onto Belmont Street. Getting behind the Pontiac, Lopes observed the rear license plate was not illuminated. He followed as the car took the first right off Belmont Street onto Newbury Street and, passing the intersection at West Elm Street, continued on Newbury to turn left onto Highland Street. Lopes clocked the Pontiac's speed to be forty to fifty miles per hour in a posted thirty mile-per-hour limit for this thickly settled residential neighborhood. One-half mile down Highland Street (the traveled distance of the two cars to this point was now about two miles), Lopes activated his blue lights and siren. The Pontiac stopped, and Lopes brought his cruiser to a halt just behind it.[2]

Lopes used his cruiser spotlight to illuminate the immediate scene and saw three persons in the two-door car. As Lopes left the cruiser and walked toward the driver's door, the driver (identified later as Jerry Dessalines) abruptly opened the door and thrust forth his foot, evidently intending to exit the vehicle. Lopes ordered him to stop. Lopes approached nearer and asked Dessalines to step out. Dessalines did so, at the same time saying, before any question from Lopes, that his driver's license was suspended because of a drug offense. Lopes quickly patted him down, finding no weapon. Dessalines had a vehicle registration in his hand, passed it to Lopes, and said the car was "the girl's mother's car," referring to the young woman in the front passenger seat (Heather Rizzotto). Dessalines asked, and asked repeatedly, whether he was going to be arrested.

Lopes ordered the passengers — Rizzotto and the man seated behind the driver's seat, the defendant Barnaby Riche — to place their hands in the air where he could see them, and they complied. At Lopes's direction, Dessalines moved to the front and put his hands on the hood.

---

[1]Troopers Stephen Lopes and Kenneth Wong testified on behalf of the Commonwealth; Dessalines and Riche in support of their motions.

[2]The stop occurred within a short distance of Rizzotto's home on Highland Street. The defendants tried to make something of the coincidence, but Riche has abandoned this line on this appeal.

Now Lopes radioed for back-up. He ordered Riche out of the car, pat-frisked him, finding nothing, and directed him to the rear of the car with his hands on the trunk.

Brockton Officer Don Mills drove up; this was within a few minutes of the radio call. In brief conversation, Lopes told Officer Mills he was going to speak with the woman "due to the fact that they said it was her mother's car, and I wanted to see if she had a license and if in fact she could drive the car away." The registration paper identified the Pontiac, but Lopes was not assured about any connection of the stated owner's name or address to the occupants of the car. Lopes approached the passenger door and asked Rizzotto whether she had a driver's license. She said yes but did not proffer a license. Lopes asked her to step out of the car. Emerging from the car, Rizzotto clutched her jacket with both hands; facing the trooper, she looked at him, then to the ground. A large plastic bag fell to her feet. Lopes suspected the bag contained drugs; in fact it held 61.63 grams of crack cocaine. Lopes ordered the three individuals to lie on the ground; Officers Lopes and Mills handcuffed Dessalines and Rizzotto; Lopes guarded Riche until Trooper Kenneth Wong and others arrived and took care of handcuffing him.

Rizzotto was booked at Brockton police headquarters. Being duly accorded Miranda warnings, she told Lopes that Riche, as the car was stopped, slipped the bag of drugs he had on him to her for hiding. Dessalines and Rizzotto were taken to State police barracks in Middleboro and held in adjacent cells in a location well marked as monitored. Riche was overheard to bewail that Rizzotto had foolishly tried to hold the bag inside her jacket instead of shoving it inside her pants.

Inventory search of the Pontiac turned up an electronic scale, a cell phone, plastic bags, and a few bars of Ivory soap. At booking Riche was found in possession of some marijuana.

*Analysis.*[3] Riche centers his attack on the lawfulness of the exit orders. The United States Supreme Court holds, interpreting the Fourth Amendment to the United States Constitution, that, where an automobile is properly "stopped," the police of-

---

[3]The defendant does not challenge, and we accept, the motion judge's findings of fact. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 97 (1997). The judge's views of the law are subject to our independent review, see *Commonwealth* v. *Selby*, 420 Mass. 656, 657 (1995); as expressed, these are consistent with our own.

ficer may, as a matter of course, order the driver and any passengers to exit the vehicle. See *Pennsylvania* v. *Mimms,* 434 U.S. 106, 111 (1977) (driver); *Maryland* v. *Wilson,* 519 U.S. 408, 415 (1997) (passengers). In this Commonwealth we have been somewhat more circumspect and demanding. We require, after a proper stop, that there be a showing of justification for an exit order, whether addressed to a driver or a passenger. Thus it is possible for an exit order to be defensible in respect to a driver, but not so as to another occupant of the car. This is not to deny that given conditions of a criminal episode may affect all occupants equally. The propositions just stated, deriving from interpretation of art. 14 of our Declaration of Rights, are elaborated in *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 662-663 (1999) (5-2 decision). See *Commonwealth* v. *Watson,* 430 Mass. 725, 732 (2000); *Commonwealth* v. *Robles,* 48 Mass. App. Ct. 490, 493 (2000); *Commonwealth* v. *Stack,* 49 Mass. App. Ct. 227, 234 (2000).

Lopes's initial stop of the Pontiac was lawful because he had observed the commission of the offenses of traveling without a rear license plate light, see G. L. c. 90, § 7; 540 Code Mass. Regs. § 4.04(8)(a) (1994); *Commonwealth* v. *Santana,* 420 Mass. 205, 207-208 (1995); *Commonwealth* v. *Garcia,* 34 Mass. App. Ct. 645, 649 (1993), and of speeding, see G. L. c. 90, § 17; *Commonwealth* v. *Heughan,* 40 Mass. App. Ct. 102, 104 (1996).[4] The situation, however, developed as much more than a routine stop for traffic violations. The unusual, precipitous move of the driver Dessalines to get out of the car would suggest to the officer a hostile confrontation or the possibility that the man intended a run for it.[5] The nearly simultaneous mention of a drug offense implicated the possibility of guns.[6] The concurrent tender of a registration not crediting ownership of the vehicle to any occupant raised a question whether the car was

---

[4]The defendant in a passing remark suggests that the stop was a pretext for legalizing a warrantless search. "It will not do to inquire into possible collateral motives on the part of the police where the violation or offense is actual, not merely imagined for the occasion." *Commonwealth* v. *Stack,* 49 Mass. App. Ct. at 234.

[5]For comparable situations, see *Commonwealth* v. *Santiago,* 30 Mass. App. Ct. 207, 210-211 (1991); *Commonwealth* v. *Va Meng Joe,* 40 Mass. App. Ct. 499, 509 (1996), *S.C.,* 425 Mass. 99 (1997) (affirmed on other grounds).

[6]See *Commonwealth* v. *Moses,* 408 Mass. 136, 143 (1990); *Commonwealth* v. *Rodriguez,* 415 Mass. 447, 451 (1993); *Commonwealth* v. *Va Meng Joe,* 40 Mass. App. Ct. at 510 n.13.

stolen.[7] Dessalines's avowal that his right to drive had been suspended was serious in itself, as it would justify arresting him on the spot.[8] His insistent questions about what the officer intended to do suggested a wish to get himself arrested and thus nominally clear of shady activity by the others in the car. The conjunction of these factors — and the time being early morning and the location a high crime area[9] — created a "reasonable suspicion," see *Commonwealth* v. *Gonsalves*, 429 Mass. at 662, of a threat to the officer's safety that supported an order to the driver to exit the car (after he pulled back into it) and equally supported such an order to each passenger.[10]

The prompt exit order to the defendant Riche had a special practical purpose beyond its safety and investigatory objects. As Lopes indicated in his testimony, it is a not uncommon practice for the police to respond to a chance of trouble by separating those in a stopped car from each other to frustrate interchange or collaboration among them (not soon enough, as it happened in the present case, to forestall the transaction of Riche's passing the plastic bag to Rizzotto for hiding). Thus Riche was ordered out of and to the rear of the car.[11]

When Lopes went toward Rizzotto, the danger of violence had abated because of the enlarged police presence, but it had not been extinguished — thus Rizzotto might have a weapon or be within reach of one; the interior of the car was as yet

---

[7]See *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. 526, 527, 528 (1995).

[8]See G. L. c. 90, § 21; 540 Code Mass. Regs. §§ 20.00-20.04 (1996).

[9]See *Illinois* v. *Wardlow*, 528 U.S. 119, 124 (2000), where the Court notes a high crime area is "among the relevant contextual considerations in a *Terry* [*Terry* v. *Ohio*, 392 U.S. 1 (1968),] analysis." See also *Commonwealth* v. *Thompson*, 427 Mass. 729, 734 (1998); Raymond, Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion, 27 Search and Seizure L. Rep. 9 (2000).

[10]For comparable situations, see *Commonwealth* v. *Santana*, 420 Mass. at 213 & n.8; *Commonwealth* v. *Valentine*, 18 Mass. App. Ct. 965, 966 (1984); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 314-315 (1992); *Commonwealth* v. *Robles*, 48 Mass. App. Ct. at 493.

In contrast: the present case is not within the band of decisions where, *after* the driver produces a valid license and registration, the officer pursued interrogation and ordered the driver or passenger out of the vehicle, all without justifiable concern for safety or reasonable suspicion that criminal activity was afoot. Article 14 prohibits such practice; see *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997); *Commonwealth* v. *Gonsalves*, 429 Mass. at 662.

[11]In given circumstances, of course, having all occupants remain in the car may be a sound police tactic.

unexplored. So the request to Rizzotto to leave the car was justified on the basis that applied as well to Dessalines and Riche. Lopes would want also to converse with Rizzotto to try to clear up the status — ownership and possession — of the car, and, finally, to learn whether she in fact had a license to drive.

It is worth emphasizing that Lopes acted moderately throughout; his acts of intrusiveness did not exceed what was required to deal with his reasonable suspicions (and need for information). See *Commonwealth* v. *Moses*, 408 Mass. 136, 141 (1990) ("[t]he degree of intrusiveness that is permitted is that which is 'proportional to the degree of suspicion that prompted the intrusion' "); *Commonwealth* v. *Mercado*, 422 Mass. 367, 371-372 (1996). Symptomatic was his decision not to use his dog, which he thought would needlessly "escalate" the situation.

On the whole, the police actions appear lawful even if we choose not to take full advantage of the court's remark in *Gonsalves*, 429 Mass. at 664, that "it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order."

The judgment is affirmed.[12]

*So ordered.*

---

[12]The Commonwealth argues that the defendant Riche should not be permitted to rely on any putative unlawfulness in the police treatment of Rizzotto because the "automatic standing" rule of *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 & n.4 (1990), is inapposite to his spatial relation to her. The Commonwealth also attacks the *Amendola* rule itself, here harkening to the Federal view of standing in a Fourth Amendment context which led to the abandonment of an automatic standing rule. See *United States* v. *Salvucci*, 448 U.S. 83 (1980); *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980). We need not enter upon these matters.