## COMMONWEALTH *vs.* DANIEL RIVERA.

No. 05-P-763.

Hampden. May 12, 2006. - September 14, 2006.

Present: GREENBERG, LAURENCE, & GRAHAM, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Threshold police inquiry, Protective frisk. *Threshold Police Inquiry. Firearms. Controlled Substances.*

A District Court judge erred in allowing a motion to suppress evidence obtained after a police officer ordered the criminal defendant to exit his motor vehicle, where the officer had a reasonable suspicion of danger that justified his exit order, given the sight of a police baton in plain view between the seats of the defendant's vehicle, combined with the defendant's nervousness and fidgeting behavior and the fact that the stop occurred in a high crime area. [364-367]

COMPLAINT received and sworn to in the Holyoke Division of the District Court Department on May 2, 2003.

A pretrial motion to suppress evidence was heard by *W. Michael Ryan,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was transferred by him to the Appeals Court.

*Bethany C. Lynch,* Assistant District Attorney, for the Commonwealth.

*Dennis M. Powers* for the defendant.

GREENBERG, J. A criminal complaint charged the defendant with carrying a firearm without a license pursuant to G. L. c. 269, § 10(*a*); possession of a class D substance in violation of G. L. c. 94C, § 32C; and a motor vehicle equipment infraction under G. L. c. 90, § 7. This is the Commonwealth's interlocutory appeal from an order of a District Court judge al-

lowing the defendant's motion to suppress evidence of marijuana and a firearm discovered during a pat-down search of the defendant. The appeal was allowed and referred to this court by a single justice of the Supreme Judicial Court. See Mass.R. Crim.P. 15(b)(2), as appearing in 422 Mass. 1502 (1996).

We draw the essential facts from the judge's findings with amplification from the record. About 8:40 P.M., State Trooper Murphy and Detective Duke of the Holyoke police were parked in an armored police cruiser in a high crime area of Holyoke. A number of shootings and drug dealing activities had occurred in the neighborhood during this time. The defendant drew the attention of the two officers because he was driving a car with an unlit headlamp. Murphy pulled behind the defendant's vehicle and signaled him to stop. This maneuver was accomplished without incident.

Both officers alighted from the cruiser and approached the vehicle, Murphy on the driver's side, and Duke on the passenger side. As Murphy got close to the door, he noticed that the defendant was the sole occupant. When Murphy asked him to produce his license, Murphy observed the defendant's hands shaking and surmised that the defendant "was nervous about something." Meanwhile, Duke looked inside from the passenger side and observed part of an object, which he recognized as the handle of a police baton, protruding from the space between the two front seats. He mentioned this circumstance to Murphy as the defendant was obtaining his license and registration papers. Before checking on their validity, Murphy asked the defendant if he had any weapons inside the vehicle. The defendant initially responded in the negative. At that point, Murphy asked the defendant to step outside the vehicle so that he could conduct a pat-down search of his person. In his direct testimony at the motion hearing, Murphy recounted that his major concern before asking the defendant to exit the vehicle was that the defendant's responses to his routine questions were uttered in a mumbling fashion, that the defendant avoided eye contact with him, and that he seemed evasive and nervous. Murphy also testified that he feared for his own safety and felt that he was at peril at the time he asked the defendant to exit the vehicle. The pat-down search produced the firearm and the marijuana that were the basis of the defendant's arrest and current charges.

The judge ruled that the police legitimately stopped the car, a proposition which neither of the parties contest. However, art. 14 of the Massachusetts Declaration of Rights does not permit the police to force the driver or passengers out of a motor vehicle during a routine stop unless there is reasonable suspicion based upon specific facts. *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662-663 (1999). *Commonwealth* v. *Williams*, 46 Mass. App. Ct. 181, 182-183 (1999). See *Commonwealth* v. *Stack*, 49 Mass. App. Ct. 227, 234 (2000) ("An exit order to a passenger not himself seen to commit any violation or offense" was permissible under art. 14 where the police had reasonable apprehension about their own safety). Here, the motion judge ruled that the police lacked the authority to order the defendant out of the vehicle because — aside from his nervous demeanor — he was compliant and obedient. The judge fobbed off the existence of the police baton inside the vehicle, stating that it was not an unlawful weapon. He ruled that the stop was not constitutionally permissible in the totality of the circumstances.

"[T]he ultimate legal conclusion to be drawn from the fact[s] developed at the hearing [on a motion to suppress] is a matter for our review, particularly where the conclusion is of constitutional dimension." *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n.18 (1980). As matter of law, we reach the opposite conclusion from the motion judge on the particular facts of this case.

In *Terry* v. *Ohio*, 392 U.S. 1, 22 (1968), the United States Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment to the United States Constitution does not require a police officer who lacks the precise information necessary for probable cause to arrest simply to shrug his or her shoulders and allow something to go awry, even during a traffic stop, if the officer's observations reasonably require further action. Although the precise constitutional line is not always easily ascertained, a police officer is allowed to take reasonable precautions for his or her own protection. See *Commonwealth* v. *Robbins*, 407 Mass. 147, 151 (1990). As has often been stated,

in applying hindsight to an officer's actions, an appellate court is mindful that, as shown by many tragic endings to threshold police inquiries, "the answer might be a bullet." *Commonwealth* v. *Silva*, 366 Mass. 402, 407 (1974), quoting from *Terry* v. *Ohio*, *supra* at 33. With respect to exit orders, the nature of which occurred here, the Supreme Judicial Court has rejected the approach of the United States Supreme Court in *Pennsylvania* v. *Mimms*, 434 U.S. 106, 109-111 (1977), that a police officer may order the driver out of a lawfully stopped vehicle as a matter of course. Instead, in *Commonwealth* v. *Gonsalves*, 429 Mass. at 662-663, the court held that art. 14 requires an officer to have reasonable suspicion of danger to himself or others before ordering a driver from a lawfully stopped vehicle. See *Commonwealth* v. *Torres*, 433 Mass. 669, 673 (2001). The standard for determining whether a belief or suspicion is reasonable is "whether a reasonably prudent man in the police [officer's] position would be warranted" in reaching such a conclusion. *Commonwealth* v. *Vasquez*, 426 Mass. 99, 103 (1997), quoting from *Commonwealth* v. *Santana*, 420 Mass. 205, 212-213 (1995). The question in this case is whether the sight of the baton in plain view between the seats of the car was enough, combined with the other described circumstances, to give rise to a reasonable suspicion of danger and justify the exit order.

The matter is close, but we conclude that the totality of the circumstances did justify the exit order and patfrisk. We acknowledge the defendant's argument that a "mere hunch" based upon a defendant's nervousness or fidgeting behavior, of itself, is not sufficient to justify an exit order. See *Commonwealth* v. *Torres*, *supra* at 673; *Commonwealth* v. *Wooden*, 13 Mass. App. Ct. 417, 419-420 (1982); *Commonwealth* v. *Nutile*, 31 Mass. App. Ct. 614, 618 (1991). But here, other factors combined to weigh heavily in the Commonwealth's favor. It "does not take much for a police officer to establish a reasonable basis to justify an exit order based on safety concerns." *Commonwealth* v. *Gonsalves*, *supra* at 664.

Cases to which the Commonwealth's brief have referred are consistent with this view. In *Commonwealth* v. *Holley*, 52 Mass. App. Ct. 659, 663 (2001), for example, a high crime area

combined with a furtive gesture was sufficient to justify an exit order. In *Commonwealth* v. *Riche*, 50 Mass. App. Ct. 830, 833-834 (2001), an early morning stop in a high crime area, together with the officer's observation of the driver's movements and his answers to the officer's questions, contributed to the behavioral gestalt that justified the defendant's removal from his vehicle.

*Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 314-315 (1992), similarly involved a motor vehicle stop, during which the officer noticed an aluminum baseball bat protruding from under the passenger seat. This observation, along with suspicious movements by an occupant of the vehicle, the possibility of the occupant's access to the bat, the presence of others in the car, and the officer's awareness of a recent fatal bludgeoning of a police officer with an aluminum bat during a routine traffic stop, were held sufficient to justify an exit order of the occupant and a patfrisk of his person.[1]

The difficulty in the defendant's case is that he, in the first instance, overreacted to the stop. Murphy testified that the defendant's hands were "shaking violently" and that his responses to ordinary police queries were practically inaudible. Simultaneously, Duke called Murphy's attention to the existence of the police baton, which triggered the exit order. From the officers' vantage, asking the defendant to get out of the vehicle so that a patfrisk could be accomplished does not seem a disproportionate measure. The " 'principle of proportionality' looks to whether the actions of the police were proportional to or exceeded what the circumstances called for at the moment." Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 5-4(c), at 5-10 (2004).

Although the Supreme Judicial Court has made the observation that nervousness, in and of itself, especially on behalf of a minority member of the community, is not enough to justify an

---

[1]The Commonwealth correctly argues that the police baton was a weapon and that the defendant, thus, lied when Murphy asked him if he had any weapons. This factor seems to make a stronger case for the Commonwealth than that in *Commonwealth* v. *Rivera*, *supra*. While an aluminum bat may have other uses, a police baton is unequivocally designed to be used as a weapon.

exit order, see *Commonwealth* v. *Gonsalves*, 429 Mass. at 663,[2] for their part, the police are "entitled to take reasonable precautions for their [own] protection," *Commonwealth* v. *Willis*, 415 Mass. 814, 820 (1993). Proportionality is a dynamic principle, and suspicion may escalate over the course of a stop. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 323-324 (2001) (observation of weapons during a routine motor stop led to a patfrisk; further observations suggested illegal drug activity, warranting a canine sniff of the car, and probable cause for searching the vehicle). In this instance, we conclude, as matter of law, that the exit order was not so intrusive as to constitute a violation of art. 14.

*Order allowing motion to suppress reversed.*

---

[2]See also *Commonwealth* v. *Feyenord*, 445 Mass. 72, 87-88 (2005), cert. denied, 126 S. Ct. 1369 (2006) (Greaney, J., concurring) (stating that a motorist must never be stopped merely because of race but only for a legitimate reason).